VICKI CRAIGMILES, Plaintiff-Appellee, v. GERTRUDE EGAN, Defendant-Appellant.

Fourth District   No. 4—92—0926

Argued May 24, 1993.—Opinion filed August 5, 1993.—
Rehearing denied September 3, 1993.

912

Karen L. Kendall and Brad A. Elward (argued), both of Heyl, Royster, Voelker & Allen, of Peoria, and Scott D. Spooner, of Heyl, Royster, Voelker & Allen, of Springfield, for appellant.

Florence L. Bain (argued), of Kanoski & Associates, of Springfield, for appellee.

JUSTICE GREEN delivered the opinion of the court:

On February 10, 1989, plaintiff Vicki Craigmiles filed a complaint in the circuit court of Sangamon County against defendant Gertrude Egan seeking damages for injuries allegedly resulting from defendant's negligence which caused a collision between automobiles driven by the two parties on February 25, 1987. At the conclusion of the evidence in a jury trial, the court directed a verdict for plaintiff finding defendant 100% liable for plaintiff's injuries. On June 26, 1991, judgment was entered on a verdict for plaintiff for $9,150. The trial court then granted plaintiff a new trial on the issue of damages only, with defendant to be 100% responsible for any damages. After that trial was held, the court entered a judgment on a verdict for plaintiff in the sum of $50,158.37.

On appeal, defendant maintains that the court erred (1) in the first trial in directing a verdict, fixing defendant's negligence as 100% of the cause of plaintiff's injuries, and in granting plaintiff a new trial under the term decreed; and (2) in denying her post-trial motion after the second trial. Plaintiff responds maintaining defendant cannot now contest the grant of the new trial because defendant did not file a timely petition for leave to appeal that order and, if that petition was timely, our denial of the petition foreclosed further consideration of that issue. Plaintiff further asserts that even if the question of the grant of the new trial is before us, the evidence at the first trial supported the direction of the verdict on the question of liability, the determination of 100% fault on defendant, and the grant of a new trial on damages. Plaintiff further maintains that evidentiary errors justified the grant of the new trial and the evidence supported the judgment entered after the second trial.

We determine that the evidence at the first trial supported a directed verdict for the plaintiff with the fault attributed 100% to defendant. However, we conclude that the issue of the propriety of the grant of a new trial on damages only is properly before us and the circuit court erred in granting a new trial to plaintiff. Accordingly, we reverse and remand to the circuit court with directions to reinstate the judgment for plaintiff entered after the first trial. Because of this ruling, we are not required to rule upon the claims of error which concern the retrial. Nevertheless, so that remand to us need not be made if we are wrong on the question of the grant of the new trial, we state that we find no reversible error arising from the second trial.

The most difficult questions in the case arise from plaintiff's assertion that any error in the grant of a new trial is not before us. Accordingly, we consider this issue first. In *Ford v. Narup* (1962), 38 Ill. App. 2d 245, 187 N.E.2d 10, the then Fourth District Appellate Court held that in order to preserve the question of the propriety of the grant of a new trial in a civil case, a party objecting to it must seek leave to appeal the order granting the new trial. Plaintiff maintains defendant did not timely do so here. Plaintiff further points out that even if defendant's request was timely, we denied the request. (*Craigmiles v. Egan* (4th Dist. February 5, 1992), No. 4—91—0735 (order).) In *Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 380 N.E.2d 786, the supreme court held that a party seeking to attack the grant of a new trial after the appellate court had denied leave to appeal from that order and after the new trial had taken place was barred from raising that issue.

At all times pertinent, Supreme Court Rule 306(a)(1) has provided that appeal from an order in a civil case granting a new trial may be taken to the appellate court upon leave granted by that court upon a petition filed in that court "in accordance with the requirements for briefs *within 30 days after the entry of the order*." (Emphasis added.) (134 Ill. 2d R. 306(a)(1).) Supreme Court Rule 306(e) then states that time limit "may be extended upon notice and motion, accompanied by an affidavit showing good cause, filed before expiration of the original or extended time." (134 Ill. 2d R. 306(e).) Plaintiff asserts that the following sequence of events indicates that defendant's petition for leave to appeal from the grant of the new trial on damages only was untimely: On June 26, 1991, a judgment was entered on the verdict in the first trial; on July 23, 1991, plaintiff's motion for a new trial as to damages was on file; on July 24, 1991, defendant's motion for new trial was on file; on August 20, 1991, a docket entry shows plaintiff's motion was allowed; and on September 10, 1991, a docket entry was made stating as follows:

> "Docket entry of August 20, 1991 consolidated with docket entry of this date. Plaintiff's motion for a new trial is allowed as to damages only and denied in all other respects. Plaintiff's motion for punitive damages included in motion for new trial denied. Defendant's claim for setoff allowed as to the amount paid to plaintiff by defendant prior to trial. Defendant's post-trial motion denied in all respects."

To continue this sequence of events, on October 10, 1991, the petition was filed in the appellate court seeking an extension of time to file petition for leave to appeal; on October 10, 1991, the appellate court

granted defendant an extension of time to file a petition for leave to appeal until January 15, 1992; on January 15, 1992, a petition for leave to appeal was filed in the appellate court; and on February 5, 1992, the appellate court denied defendant leave to appeal. *Craigmiles v. Egan* (4th Dist. February 5, 1992), No. 4—91—0735 (order).

Plaintiff correctly points out that under Supreme Court Rule 306, petitions for leave to appeal from an order granting a new trial or requests in the appellate court for extension of the time for filing must be filed within 30 days of the entry of the order granting a new trial. (*Odom v. Bowman* (1987), 159 Ill. App. 3d 568, 511 N.E.2d 1265; *Buckland v. Lazar* (1986), 145 Ill. App. 3d 436, 495 N.E.2d 1254.) Plaintiff contends that the purported allowance of plaintiff's motion for a new trial on August 20, 1991, started the running of the 30-day period of Rule 306(a)(1), and that period had expired long before defendant filed a motion in this court for an extension.

■ Plaintiff's theory of the expiration of the 30-day period requires careful consideration. On August 20, 1991, when the docket entry indicating allowance of plaintiff's motion was entered, defendant's motion for a new trial was pending. The court made no reference to any ruling on it until the docket entry of September 10, 1991. Had the court allowed defendant's motion for a new trial, the trial would have included the question of liability. Thus, the court's ruling upon whether a new trial should be granted and, if so, the issue to be tried was incomplete at the time of the August 20, 1991, docket entry. In recognition of this problem, the circuit court phrased its August 20 order in such a way as to make a complete ruling. We hold that the 30-day period of Rule 306(e) began to run on September 10, 1991, and defendant's petition for extension of time was filed within that period. Accordingly, a valid petition for leave to appeal was ultimately filed. We need not decide whether *Ford* is still the law or whether a failure to seek leave to appeal would have waived any error in the grant of the new trial.

We next consider whether our prior refusal to grant defendant leave to appeal from the order granting a new trial on the question of damages only is to be given *res judicata* effect, thus prohibiting us from considering that question now. In *Robbins*, a plaintiff in a wrongful death case received a verdict for what was apparently a small amount for damages. The circuit court granted that plaintiff a new trial on the question of damages. The appellate court denied leave to appeal, and a much larger sum was awarded at the second trial. On appeal to the appellate court, in a split decision, that court

held that its prior refusal to grant appeal from the order granting the new trial on damages precluded raising that issue on appeal after the second trial. *Robbins v. Professional Construction Co.* (1977), 45 Ill. App. 3d 524, 529, 359 N.E.2d 1121, 1125.

After granting leave to appeal in *Robbins*, the supreme court upheld the holding that the denial of leave to appeal the grant of the new trial barred further consideration of that issue. The supreme court pointed out that the defendant, in seeking leave to appeal to the appellate court the order granting a new trial, had failed to follow the requirements of Supreme Court Rule 306 and that the appellate court had "dismissed the appeal." (*Robbins*, 72 Ill. 2d at 219, 380 N.E.2d at 787.) The appellate court opinion had indicated that it denied the petition for leave to appeal. (*Robbins*, 45 Ill. App. 3d at 529, 359 N.E.2d at 1125.) In any event, the supreme court upheld the appellate court's refusal to consider the propriety of the grant of the new trial. The court reasoned that if further consideration of the grant of a new trial were permitted, Supreme Court Rule 306(a)(2) (58 Ill. 2d R. 306(a)(2)) would bring up all of the rulings of the trial court again, and no reason existed to reconsider the grant of the new trial after the appellate court had refused to grant leave to appeal. The court concluded that due process permitted the perfunctory consideration that would be given to the question of whether to grant leave to appeal by the appellate court. *Robbins*, 72 Ill. 2d at 223, 380 N.E.2d at 789.

Plaintiff notes that the second district has recently followed the *Robbins* ruling in *In re Marriage of Clark* (1992), 232 Ill. App. 3d 342, 597 N.E.2d 240. There, the court stated summarily, "our denial of [petitioner's] earlier petition for leave to appeal the trial court's order for a new trial pursuant to the provisions of Supreme Court Rule 306 is not subject to relitigation before this court." (*Clark*, 232 Ill. App. 3d at 346, 597 N.E.2d at 243, citing *Robbins*, 72 Ill. 2d at 222, 380 N.E.2d at 789.) The second district provided no further discussion on this issue.

The fifth district recently discussed *Robbins* in a case that is factually similar to the instant case. In *Koenig v. National Super Markets, Inc.* (1992), 231 Ill. App. 3d 665, 596 N.E.2d 1329, *appeal denied* (1992), 146 Ill. 2d 630, 602 N.E.2d 455, the court dealt with the issue and held the prior denial of defendant's Rule 306 petition did not foreclose defendant from raising the same issues on appeal following a second trial.

In *Koenig*, a jury awarded plaintiff $100,000 but found her 85% contributorily negligent and reduced her award to $15,000. The trial court granted plaintiff's motion for a new trial on the issue of dam-

ages only. Defendant had also filed post-trial motions seeking a judgment *n.o.v.* or, in the alternative, seeking a new trial on the issue of liability and damages. The trial court denied defendant's motions. Defendant then filed a petition for leave to appeal pursuant to Supreme Court Rule 306, and the fifth district denied defendant's petition.

A second trial on damages only resulted in a verdict in favor of plaintiff for $90,000 and found plaintiff 33⅓% negligent. Defendant appealed raising a number of issues, including the propriety of the original grant of a new trial.

On appeal, the *Koenig* court found that the denial of defendant's prior Rule 306 petition for leave to appeal did not preclude defendant from raising the issues contained therein on appeal after the second trial. The court cited *People v. Vance* (1979), 76 Ill. 2d 171, 390 N.E.2d 867, decided subsequent to *Robbins*, which held:

> "Our denials of leave to appeal, of course, carry no connotation of approval or disapproval of the appellate court action, and signify only that four members of this court, for reasons satisfactory to them, have not voted to grant leave." (*Vance*, 76 Ill. 2d at 183, 390 N.E.2d at 872.)

Following this logic, the *Koenig* court determined that its previous order denying defendant's petition meant "only that at least two members of a three-member panel voted not to grant leave 'for reasons satisfactory to them.' The court did not address the merits of the case." *Koenig*, 231 Ill. App. 3d at 667, 596 N.E.2d at 1332.

Most persuasive with us is the fairly recent decision in *Kemner v. Monsanto Co.* (1986), 112 Ill. 2d 223, 492 N.E.2d 1327. That case concerns not the well-known rule set forth in *Vance* that refusal by the supreme court to grant leave to appeal has neither precedential nor *res judicata* value, but the *res judicata* effect of the denial by the appellate court of a petition for leave to appeal pursuant to Supreme Court Rule 306(a)(1)(ii) (94 Ill. 2d R. 306(a)(1)(ii)) permitting petitions for leave to appeal to the appellate court from orders denying motions to dismiss upon *forum non conveniens* grounds.

In *Kemner*, a defendant sought an original writ of *mandamus* from the supreme court to compel the circuit court to grant a motion to dismiss on *forum non conveniens* grounds after the circuit court had refused to do so. Supreme Court Rule 306(a)(1)(ii) had not yet been enacted. That defendant then filed another motion to dismiss on the same ground, and that was denied. By then, Supreme Court Rule 306(a)(1)(ii) was in force, and the defendant petitioned the appellate court for leave to appeal. That petition was denied, and the supreme

court denied appeal from the appellate court order of denial. That defendant then filed a motion in the trial court for reconsideration of the *forum non conveniens* motion, adding additional information. The circuit court denied the motion, and the appellate court dismissed for want of jurisdiction that defendant's petition for leave to appeal as untimely. The supreme court granted leave to appeal from that order.

The *Kemner* court held that the appellate court had erred in dismissing that plaintiff's motion for reconsideration. The court deemed the motion to reconsider to in fact be a new motion, on which basis it was timely. The court then addressed the question of whether the prior denial of leave to appeal from the circuit court's earlier denial of a *forum non conveniens* motion barred reconsideration of that issue, stating:

> "The *res judicata* effect for which the plaintiffs here argue was explicitly rejected in *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, [463 N.E.2d 792,] a case which arose out of the same occurrence as the present case. In *Lowe*, the defendant railroad filed a petition for *mandamus* and a petition for leave to appeal to this court concerning the *forum non conveniens* rulings of the circuit court. Plaintiffs argued that since both petitions were denied by this court, the *forum non conveniens* issue was foreclosed. The *Lowe* court disagreed, reasoning that 'the denial of a petition for an extraordinary writ, or the denial of a petition for interlocutory review, means only that a majority of the upper court could not be mustered in favor of the petition. It is not an exotic form of *res judicata*.' (124 Ill. App. 3d 80, 90[, 463 N.E.2d 792].) We agree with the reasoning of the appellate court in *Lowe* and conclude that Monsanto had a right to file a petition for leave to appeal from the December 13, 1984, order denying its motion to reconsider." *Kemner*, 112 Ill. 2d at 240-41, 492 N.E.2d at 1335.

Supreme Court Rule 306 provides for discretionary appeal from not only grants of new trials and denials of *forum non conveniens* motions, but also for such appeals from a variety of other interlocutory orders. Giving *res judicata* effect to denials of appeal from certain of those orders and not as to others would not appear to be sensible. We interpret the quoted language from the *Kemner* opinion to hold that denials of leave to appeal under Supreme Court Rule 306 are no bar to further raising of the issues involved. Accordingly, to the extent that the foregoing is inconsistent with the holding in *Robbins*, we conclude that the *Kemner* opinion overruled *Robbins sub silentio*. The

questions concerning the rulings of the circuit court on the motions for a new trial are before us on this appeal.

■ The circuit court's grant of a directed verdict to plaintiff on the question of liability at the conclusion of the evidence in the first trial was fully supported by the record. The collision was one where the front end of an automobile driven by defendant crashed into the rear of one driven by plaintiff at an intersection protected by stoplights. The vehicles were travelling in an easterly direction on a Springfield street. Defendant testified (1) she was searching for a certain business; (2) as she approached the intersection she was driving at a speed of 30 to 35 miles per hour; (3) she saw the light turn green; (4) she first noticed plaintiff's vehicle was not moving when she was within 30 feet of it; and (5) she then applied her brakes and was moving at a rate of approximately 15 to 20 miles per hour when her vehicle struck plaintiff's vehicle. No evidence of any other witness was helpful to defendant although one witness indicated that some dust may have been floating in the air at the time of the collision because a street sweeper had been working in the area. However, defendant did not complain of obstructed vision.

The mere existence of a rear-end collision is insufficient to make a determination, as a matter of law, that the driver of the rear car was negligent, or that the driver of the front car was in the exercise of due care. (*Burgdorff v. International Business Machines Corp.* (1979), 74 Ill. App. 3d 158, 163, 392 N.E.2d 183, 186.) However, here no evidence indicated that plaintiff made a sudden stop or a veer from the line of traffic which she was in. Plaintiff testified she had removed her foot from her brake at the time of the collision. Defendant argues that this misled her in some way because, upon plaintiff's release of her foot brake, the rear brake lights went off. Defendant may have assumed plaintiff would accelerate upon removal of her foot from the brake but any such assumption was not reasonable. Plaintiff had no duty to accelerate rapidly when the light changed, and defendant, who had full view of plaintiff's vehicle, must be considered negligent in not controlling her speed sufficiently so as to avoid hitting plaintiff's car. (See *Ziekert v. Cox* (1989), 182 Ill. App. 3d 926, 933, 538 N.E.2d 751, 756.) The evidence here so favored the plaintiff that no verdict finding defendant free from fault and plaintiff negligent could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

The question of whether the court should have granted a new trial on the question of damages after the verdict on the first trial was received is more complicated. The evidence was undisputed that plain-

tiff had a preexisting back injury. She maintains it was substantially aggravated. The jury verdict for $9,150 was itemized to grant $5,000 for aggravation of a preexisting injury, $3,750 for medical expenses, $400 for lost earnings, and nothing for pain and suffering or disability and disfigurement. The court deemed these damages inadequate.

A jury has substantial discretion in determining the amount of damages, but a new trial may be awarded if the damages are manifestly inadequate, if clear proof of the damages has been ignored, or if the award bears no reasonable relation to the loss suffered. (*Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 407, 485 N.E.2d 4, 6.) Plaintiff maintains the circuit court did not abuse its discretion in granting a new trial on damages, particularly in view of the fact that the jury found some aggravation of substance but found absolutely no additional pain and suffering occurred. We disagree, concluding that the amount and itemization of the verdict was supported by the evidence, and the trial court abused its discretion in granting a new trial on that basis.

Comprehensive recitation of the evidence is necessary to determine whether the evidence justified the low amount of the verdict and its failure to award anything for pain and suffering. We first consider plaintiff's testimony relating to her damages, which is as follows: (1) she was 43 years old at the time of trial and had been employed as a "care giver" at a nursing home for approximately six months; (2) she had previously been employed as a housekeeper and care giver at other such facilities and was doing that kind of work at the time of the accident; (3) prior to the accident, in 1984 or 1985, she was working as a cook at Menard Convalescent Center (Menard) and hurt her lower back while lifting some trays; (4) she later sought treatment from Dr. Paul Walton, a chiropractor; and (5) her complaints when she first saw Walton in September 1986 included "slight pains going through my shoulders and down my arms and some numbness and tingling, more pain on my lower back."

Plaintiff then testified that (1) after Walton treated her with ultrasound, heat, and manipulation, her neck and shoulders "got somewhat better," and her lower back "got better, but it took longer"; (2) while Walton was treating her for her Menard injury, he sent her to get an "MRI" (magnetic resonance imaging) of her cervical spine in October 1986; (3) she told Walton in October 1986 that, in addition to her low-back pain, her neck "hurt some, that [she] had some pain but not much"; (4) she said the pain with regard to her neck and shoulders was "going down here through my neck and on to my shoulders and down into the lower part of my arms"; and (5) prior to February

1987, she had "small, dull aching pains" in her neck and shoulders, in addition to the sharper, more severe pains in her lower back.

Plaintiff said that immediately after the impact: (1) her glasses flew off of her face, hit the windshield, and bounced back to the backseat; (2) she hit her arm on the gearshift; (3) she felt "shaky"; (4) she told a woman who came up to her car after the collision that "I think I'm all right, I'm not for sure"; and (5) following the accident, plaintiff talked to defendant, the reporting police officer, and Donna Millmore, an occurrence witness, and on each occasion, she stated she thought she was fine except that she bumped her wrist. She refused to be taken to the hospital.

Plaintiff further testified that after leaving the scene of the accident, she went to work and then to an appointment she had previously scheduled at her chiropractor's office. She said she had pain in her neck and shoulders, and Walton took an X ray and gave her a cervical collar. Plaintiff testified that after the accident she felt "a lot of pain through my neck and shoulders and down my arms, more severe than they were before the accident." She said, starting the day after the accident, she had numbness and tingling in both arms, headaches, and her lower-back pain became worse.

Plaintiff testified that she continued treatment with Walton, her chiropractor, and he subsequently referred her to Dr. Trudeau and Dr. Robert Hayner, a neurosurgeon. On June 28, 1987, Hayner performed surgery on her upper back. She said she was discharged from the hospital on July 3, 1987, and was off work for three weeks. She said the pain was "a little better, but not much" after the surgery, and she continued to be treated by Walton for "a few months." She said her neck gradually got better, but she was not 100% better. She claimed to be weaker and unable to lift anything heavy. She said she still had some pain and stiffness. She indicated she could not dance the way she had before the accident, and it hurt her shoulders to throw a frisbee.

Plaintiff testified she had medical bills from the "MR Center" for $1,141, $2,250 to Hayner, $2,437.37 to Memorial Medical Center, $692 to Trudeau, and $4,519 to Walton's clinic, all resulting from the accident. She said her total lost wages following the surgery were $420.

On cross-examination, plaintiff admitted she had been treated by Walton since September 1986, and in her "Application for Treatment" with him, which she completed on September 28, 1986, she indicated she was experiencing "a dull pain in the lower back and shoulders and neck." She also stated on that form "when lifting heavy objects, it pulls on my back." She circled the neck area and lower-back area on a

diagram of a human and indicated there was "tightening" in the neck area. Finally, also on the form, she wrote in that she "could not move heavy objects" at home or at work, "could not do sports," and had to "sleep sitting up." She testified that she had been involved in a prior motor vehicle accident as a child.

Walton then testified as follows: (1) he first saw plaintiff in September 1986, when she came to his office complaining of low-back pain, pain in her shoulders and neck, and pain in her left leg; (2) she also complained at that time of experiencing a "tightening" across her neck and shoulders and that she had been in a prior car accident as a child; (3) he initially treated her with ultrasound and diathermy as well as manipulation; (4) in October 1986, he referred her to Dr. Joseph Norfray for an MRI of her cervical spine; and (5) the MRI scan revealed (a) grade 1 interior slippage of C6 on C5, (b) compression of the thecal sac by the posterior inferior aspect of C5, (c) degenerating disc at C5-C6, which tracks posteriorly and does not extend past the vertebral body of C5, and (d) moderate spinal stenosis at the level of C5-C6 related to both spondylolisthesis and prominence of the ligamentum flavin posteriorly.

Walton also stated (1) a CT scan was also performed on plaintiff's lumbar area which revealed "normal" disc space levels, and was reported to be clinically insignificant; and (2) based on Norfray's findings, Walton continued his treatment of ultrasound, diathermy, and manipulations. On direct examination Walton testified that, during the months of November 1986 through January 1987, plaintiff's symptoms were beginning to resolve and her condition was improving. He admitted on cross-examination, however, that his medical records did not reveal he was going to release her or that her condition was improving. He agreed there were no references in his records to lumbar spine X rays, and the record showed three references to cervical spine X rays during that period.

Walton testified that on February 25, 1987, the day of the accident, she kept a previously scheduled appointment to see him. He said she came in that day complaining of pain resulting from the accident she had that day. He said he took X rays of her back and neck and placed her in a cervical collar. He said she reported that she had "on and off" sharp pain and a lot of stinging in her cervical spine.

A report of a second MRI performed by Dr. Sung-Ho-Song on March 4, 1987, was admitted into evidence. It indicated that this scan demonstrated a "slight" increase in the stenosis at C5-C6 when compared with the previous MRI on October 9, 1986. Sung-Ho-Song also noted subluxation at C5 and C6, with posterior subluxation of C5 on

C6. The report stated that with increasing subluxation, there is an increase in the degree of impingement upon the thecal sac anteriorly and posteriorly at the same level. Finally, the report indicated there was degenerative disc disease at C5-C6. The report did not indicate whether the degenerative disc disease had changed since the October MRI.

Walton testified that based upon the report from Sung-Ho-Song, he diagnosed plaintiff's condition as severe cervical sprain with increased subluxation and stenosis. At that time he did not refer her to a neurosurgeon but did refer her to Dr. Trudeau, who performed an electrodiagnostic examination (EMG) with reported C5-C6 radiculopathy, which means she had nerve impingement at that level. Walton stated that Trudeau indicated in his report that he could not, however, provide a percentage differentiation between the level of plaintiff's problems in her cervical spine before and after the motor vehicle accident.

On June 1, 1987, a third MRI of plaintiff's cervical spine was performed which reported essentially identical findings to the MRI taken in March 1987. Walton said he then referred plaintiff to Dr. Hayner, a neurosurgeon, who subsequently performed a C5-C6 diskectomy in June 1987.

Walton testified that following the surgery, he continued treating plaintiff for a cervical sprain. He stated the purpose of his chiropractic treatment was to treat the muscle injury rather than the condition which necessitated surgery. He said in October 1987, plaintiff achieved maximum medical improvement and was "as good as [she was] probably ever going to get." Plaintiff's last visit with Walton was in October 1987.

Walton testified that in his chiropractic opinion the automobile accident in February 1987 aggravated plaintiff's preexisting cervical stenosis and the subluxation of the cervical spine. He was also of the opinion that the accident caused plaintiff pain and caused muscle and ligament damages. He considered plaintiff's condition to be permanent and indicated she was now more susceptible to chronic neck pain and degeneration.

On cross-examination, Walton acknowledged that when plaintiff came to his chiropractic clinic in September 1986, she was seeking lasting correction of her neck, back, and shoulder problem. He said her major complaints at that time were pain in the neck, shoulders, low back, and left leg. He said she did not differentiate her level of pain between her low back and cervical area on her application for treatment. He testified the only area of pain and discomfort indicated

on the human diagram on an application for treatment which she had filled out was the cervical area. He noted the application listed that plaintiff had pain upon lifting or walking for long periods of time and that this was affecting her housecleaning duties both at home and at work. He also noted the application indicated plaintiff could not engage in sports activities and had to sleep sitting up.

Walton testified that the notation of "hand PNN" on the application for treatment could have been his indication for tingling or paresthesia in the hand. He acknowledged that plaintiff's condition at that time was one of chronic pain and that it was possible the pain was congenital.

Walton testified that with respect to the Norfray report, the spinal stenosis condition was compressing the spinal cord. He conceded the overall findings of the Norfray report revealed an abnormal condition of the cervical spine which could cause symptoms of muscle ache and tingling and numbness as well as reversal of the normal cervical lordosis. He further admitted that the degenerative disc disease found at C5-C6 would be consistent with the problems plaintiff had been experiencing over the last two years.

Walton testified on cross-examination that since September 1986, he had seen plaintiff on 32 occasions, and on 29 of these occasions he performed cervical traction. He also acknowledged that he performed three cervical X rays between September 1986 and the time of the plaintiff's February 1987 accident yet performed no lumbar X rays. He nevertheless maintained that despite this treatment to the cervical area he was primarily treating plaintiff for a low-back condition.

Plaintiff presented the evidence deposition of Dr. Sung-Ho-Song, the radiologist who interpreted the March and June 1987 MRI reports. Sung-Ho-Song testified that he compared the March 1987 MRI and the report from the October 1986 MRI and found the same impingement condition existed in both. He further stated that the 1987 MRI revealed the same compression of the thecal sac, the same degenerative disc disease, and the same reversal of the normal cervical lordosis as was demonstrated in the October 1986 MRI. Although Sung-Ho-Song was not able to offer an explanation as to what caused the stenosis or the subluxation, he was of the opinion that the stenosis could be the product of a long-term degenerative disc disease.

On cross-examination, Sung-Ho-Song admitted the increase in subluxation demonstrated in the March 1987 MRI was only "slight." He also testified on direct examination that the level of stenosis and nerve root impingement had increased since the October 1986 MRI scan, but that this was only an assumption made during his deposition

and was not found in his report. He said such a determination would have been made from X rays rather than MRI reports.

Dr. Robert Hayner, the neurosurgeon who performed the plaintiff's neck surgery, testified he first saw plaintiff on June 15, 1987, on referral from Dr. Walton. He stated that on that visit, plaintiff complained of pain in her upper left extremity and pain in her neck following an automobile accident four months earlier. His physical examination of plaintiff was normal except for subjective sensory loss along the C6 dermatome on the left and weakness of the left bicep. His examination revealed no positive findings with the right extremities.

Hayner diagnosed plaintiff's condition as a herniated disc at C5 through C6 on the left. On June 26, 1987, he performed an anterior diskectomy at C5-C6. He released plaintiff from the hospital on July 2, 1987, with no restrictions. Hayner testified that plaintiff was to return for an evaluation on a monthly postoperative basis, but she never did return for evaluation following her discharge.

On cross-examination, Hayner reported that plaintiff did not inform him of any problems with her neck prior to the February 25, 1987, accident. He said he was also unaware that plaintiff had been diagnosed before the accident as having degenerative disc disease, spondylolisthesis, a reversal of lordotic curve, and stenosis. In addition, Hayner said he was unaware that plaintiff had undergone an electromyogram by Trudeau and had been diagnosed as having mild C5-C6 radiculopathy on the right. He concluded his testimony by stating that his only basis for concluding the herniated disc was caused by the February 1987 accident was what plaintiff told him.

Plaintiff's husband, Norman Craigmiles, then testified that before her 1987 accident, plaintiff had been active in sporting activities and had only lower-back pain. He testified that plaintiff could get around fine, but after the accident she had pain in her shoulders and numbness in the arms and could not do a lot of household things. He said he noticed a large knot on the back of her neck after the accident. He also stated that since the accident, they had been unable to go camping, because she could not get around and unpack supplies or pick up anything heavy. He also stated that she had to quit participating in the Special Olympics because of the accident. Prior to the accident she helped in the Special Olympics in games, but afterward, could only keep score.

Mary Nelson, a former co-worker and friend of plaintiff, testified that she had known plaintiff for 20 years and that plaintiff had complained about arm and neck pain only since the February 1987 accident. She stated that prior to the accident plaintiff was only some-

what limited in her activities due to her low back. She testified that since the accident she had heard plaintiff say she could not participate in sports.

Defendant presented Dr. William Schroeder, an orthopedic surgeon who specializes in spine surgery and who examined plaintiff in November 1990. He also conducted a review of plaintiff's medical records. Schroeder testified that during his examination of plaintiff, she complained of trouble sleeping, neck pain, pain in her shoulders and right arm, and numbness in the middle fingers of her right hand. He said his physical examination revealed no difference in strength from left to right extremities and found reflexes to be symmetrical. Schroeder testified that he found "symptom magnification" during examination of plaintiff. He stated she had more motion when he distracted her than she did when she was not distracted. Schroeder stated that, although plaintiff did suffer some pain, he was of the opinion that she was not disabled. He also testified she was suffering from degenerative disc disease which was aggravated by the February 25 accident. He testified the changes in the degree of plaintiff's C5-C6 subluxation, from October 1986 to March 1987, were minimal and they were consistent with a normal progression of degenerative disc disease.

The last person to testify was plaintiff's job supervisor, Linda Moss. She testified that she had repeatedly asked plaintiff for a written statement from her doctor confirming that plaintiff had lifting restrictions. She said she asked plaintiff to provide this information on four separate occasions, including during her initial job interview. She said that plaintiff never provided the statement. On cross-examination, Moss admitted that plaintiff had indicated on her application that she would not be able to do any heavy lifting.

■ Citing *Klatt v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 481, 211 N.E.2d 720, *Lombard Park District v. Chicago Title & Trust Co.* (1968), 103 Ill. App. 2d 1, 242 N.E.2d 440, and *Greco v. Coleman* (1985), 138 Ill. App. 3d 317, 485 N.E.2d 1118, plaintiff points out the well-accepted rule that a trial court has substantial discretion in determining whether to grant a new trial. *Klatt* and *Lombard Park District* both concern whether rulings on evidence permit a trial court to grant a new trial. In *Greco*, as here, the issue was whether the trial court properly granted a new trial on damages because of inadequacy or inconsistency of the award of damages.

The *Greco* court stated:

> "It is well established that whether a motion for a new trial is to be granted is within the sound discretion of the trial court

and should not be disturbed unless a clear abuse of discretion appears in the record. (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 214, 398 N.E.2d 188, 197; *Brown v. Johnson* (1978), 60 Ill. App. 3d 76, 78, 378 N.E.2d 757, 758-59.) Since, as a general rule, a new trial will not be granted on the ground that damages in personal injury actions are considered to be inadequate, appellate review of the granting of a new trial limited solely to the issue of damages is essentially a review of the trial court's discretion. An abuse of discretion will be found where there is no recognizable basis in the record to support the granting of a motion for a new trial. (*Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 647-48, 432 N.E.2d 1267, 1272.) After carefully reviewing the record on appeal, we cannot say that the trial court abused its discretion." (*Greco*, 138 Ill. App. 3d at 322, 485 N.E.2d at 1121.)

Even by the foregoing standard, the circuit court abused its discretion here in granting a new trial as to damages because the jury could have concluded that plaintiff suffered no substantial pain and suffering after the collision which, because of her preexisting condition, she would not have suffered anyway and damages awarded otherwise covered the aggravation of her injury. Thus, the court had no basis recognized in the law upon which to grant a new trial on damages.

Here, the jury could have found the most persuasive medical testimony to be that of Dr. Schroeder, when he testified that in his opinion, although the 1987 collision did aggravate plaintiff's preexisting subluxation from October 1986 (before the collision) to March 1987, the changes in the degree of subluxation after the collision were minimal and were consistent with the normal progression of degenerative disc disease. Dr. Sung-Ho-Song, the radiologist who interpreted the MRI scan, admitted that the post-accident film showed the same conditions as the films taken in October 1986 and that plaintiff's stenosis could be the product of long-term degenerative disc disease.

The jury could also have given substantial significance to Dr. Schroeder's statement that plaintiff magnified her limitations of movement when being questioned about a specific movement. Considering that testimony, and the amount that plaintiff had to gain by maximizing her injuries, the jury could have given little weight to her statement about how her pain was greater after the collision.

Even the testimony of Dr. Walton was somewhat impeached. Bias was shown by evidence that, as often is the case, he had not been paid in full and had a lien upon any recovery plaintiff would make. He testified that his primary treatment of plaintiff before the collision

was to her lower back. He said, however, he had taken three X rays of the upper-back (cervical) area during that time and 29 of the 32 treatments he had given her during that time involved manual cervical traction while no X rays of plaintiff's lower spine were taken then and the CT scan of that area was deemed insignificant.

While the jury was in no way required to diminish the credence it gave to the testimony of plaintiff and Dr. Walton, it was entitled to do so. The fact that the jury found aggravation of the prior injury did not require it to find the existence of new pain and suffering beyond that which plaintiff would have from her existing condition. In *Perry v. Storzbach* (1990), 206 Ill. App. 3d 1065, 565 N.E.2d 211, a plaintiff was awarded $35,000 for disability and nothing for pain and suffering for aggravation for a preexisting injury. A treating physician testified that in his opinion the injuries plaintiff complained of resulted from the automobile collision giving rise to the litigation. However, when informed of the previous condition, he stated he would conclude that the injuries had multiple causes. The circuit court's denial of a new trial was upheld on appeal.

Similar decisions upholding denials of new trials where damages have been awarded for injuries which ordinarily would cause pain when preexisting injuries producing the same type of pain existed have been upheld in *Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 558 N.E.2d 493, *Paulan v. Jett* (1989), 190 Ill. App. 3d 497, 545 N.E.2d 1377, and *Griffin v. Rogers* (1988), 177 Ill. App. 3d 690, 532 N.E.2d 591. See also *Chrysler v. Darnall* (1992), 238 Ill. App. 3d 673, 606 N.E.2d 553.

Cases cited by plaintiff in support of her contention that the damages were inadequate as a matter of law are materially different. Many, such as *Hollis*, concern a tremendous disparity between the severity of the injury unquestionably resulting from the occurrence involved and the amount of the award. Others do concern the situation here where some award was made for medical expenses without any award for pain and suffering. They differ from the situation here principally because there, the jury could not have found that all pain and suffering of substance was the result of a former injury. *Kumorek v. Moyers* (1990), 203 Ill. App. 3d 908, 561 N.E.2d 212.

In *Healy v. Bearco Management, Inc.* (1991), 216 Ill. App. 3d 945, 576 N.E.2d 1195, and *Hinnen v. Burnett* (1986), 144 Ill. App. 3d 1038, 495 N.E.2d 141, in addition to the lack of a former injury which could have caused pain, the jury clearly awarded damages for pain-relieving medicine but gave nothing for pain. In *Rice v. Merchants National Bank* (1991), 213 Ill. App. 3d 790, 572 N.E.2d 439, in a situa-

tion where the plaintiff had no prior injury likely to have caused pain, the jury awarded $48,000 for medical expenses but nothing for pain and suffering. In *Schranz v. Halley* (1984), 128 Ill. App. 3d 125, 469 N.E.2d 1389, the minor on whose behalf suit was brought had received a basal skull fracture, a concussion, and cerebral contusions in a fall from a second story. The effect of the verdict was to award her nothing for pain and suffering.

■ We do not agree with plaintiff that other grounds support her being granted a new trial. She complains of the admission at trial of testimony by her job supervisor when that person testified she had requested that plaintiff furnish documentation for her request for a weight-lifting limitation in regard to her job and plaintiff had not furnished it. The evidence had some slight relevance to the extent of plaintiff's injuries and was not substantially prejudicial. Defendant also introduced evidence that, in a deposition, plaintiff had testified that at the time of the collision, after the light had turned green she noted that the westbound traffic had already proceeded forward. At trial plaintiff testified she could not remember whether this was so. The matter involved was of little significance but no substantial prejudice resulted. Those evidentiary rulings did not support the granting of a new trial.

The other claimed ground for a new trial was defense counsel's statement in closing argument that "Dr. Walton got up on the stand and he raised his right hand and swore to tell the truth and stuck [out] his left hand and said but I want my money." Reference to the pecuniary interest which a witness has in a case is a proper subject of comment. We find no substantial prejudice to plaintiff resulted from the manner in which defense counsel argued as to that issue. The circuit court did not abuse its discretion in permitting this argument.

■ We next discuss defendant's contentions that she was entitled to a judgment or new trial after the second trial only to avoid the necessity of remandment to us to decide the issue if we are determined to have erred in reinstating the judgment after the first trial. The evidence at the second trial was sufficiently similar to that at the first trial to make further recitation of the evidence unnecessary. We deem a sufficient response to defendant's contentions to be that while a jury could have reasonably made the award it made at the first trial, a jury could also have concluded that the aggravation of plaintiff's injuries was severe, creating substantial pain and suffering and supporting the verdict. If the grant of the new trial was proper, we would affirm the judgment on the verdict of the second trial.

However, on the basis of our decision in regard to the judgment on the original verdict, we reverse the judgment appealed which was entered on the second verdict and remand to the circuit court of Sangamon County with directions to reinstate the judgment in favor of plaintiff in the sum of $9,150 plus costs entered on June 26, 1991.

Reversed and remanded with directions.

STEIGMANN, P.J., and COOK, J., concur.