ROBERT SNELSON, Plaintiff-Appellant, v. DONALD KAMM *et al.*, Defendants-Appellees.—ROBERT SNELSON, Plaintiff-Appellee, v. DONALD KAMM, Defendant-Appellant (St. Mary's Hospital of Decatur, Defendant).— ROBERT L. SNELSON, Plaintiff-Appellant, v. DONALD KAMM *et al.*, Defendants-Appellees.

Fourth District     Nos. 4—00—0418, 4—00—0419, 4—00—0432 cons.

Argued December 13, 2000.—Opinion filed February 28, 2001.

Patrick S. O'Shaughnessy (argued) and Christopher R. Doscotch, both of Janssen Law Center, of Peoria, for appellant.

Michael J. Kehart (argued) and Albert G. Webber, both of Kehart Shafter Webber Campbell & Robinson, of Decatur, for appellee Donald Kamm.

Richard J. Wilderson and April G. Troemper, both of Graham & Graham, Ltd., of Springfield, and Hugh C. Griffin (argued) and Stevie A. Kish, both of Lord, Bissell &·Brook, of Chicago, for appellee St. Mary's Hospital of Decatur.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In January 1996, plaintiff, Robert L. Snelson, sued defendants, Dr. Donald Kamm and St. Mary's Hospital of Decatur (St. Mary's), for medical malpractice. Following a June 1999 jury trial, the jury returned a verdict in favor of Snelson and against Kamm and St. Mary's and awarded Snelson $7 million.

Following an April 2000 hearing on defendants' posttrial motions, the trial court entered an order (1) granting St. Mary's motion for judgment notwithstanding the verdict (judgment *n.o.v.*) and (2) setting aside the $7 million damage award against Kamm and granting a retrial on the issue of damages.

This court granted separate petitions for leave to appeal by Snelson (Nos. 4—00—0418, 4—00—0432) and Kamm (No. 4—00—0419). See 166 Ill. 2d R. 306(a)(1). On appeal, Snelson argues that the trial court erred by (1) granting Kamm a new trial on the issue of damages and (2) granting St. Mary's motion for judgment *n.o.v.* Kamm argues in his appeal that (1) the trial court erred by (a) allowing the testimony of Snelson's medical expert because it lacked foundation, (b) ruling that Kamm could not cross-examine Snelson's medical expert regarding his potential bias, (c) giving certain instructions to the jury, and (d) admitting into evidence all of Snelson's medical bills incurred since the unsuccessful aortogram; (2) the jury (a) considered extraneous information and (b) demonstrated impropriety in conducting its duties; and (3) the jury's verdict was against the manifest weight of the evidence. We affirm and remand with directions for a new trial on the issue of damages.

## I. BACKGROUND

In Snelson's January 1996 complaint, he alleged that following an unsuccessful translumbar aortogram that another physician had performed on him on March 2, 1994, Kamm negligently (1) failed to diagnose "the acute mesenteric occlusion and infarction," (2) delayed diagnosis of the acute mesenteric occlusion and infarction, (3) failed to perform sufficient diagnostic tests immediately following the unsuccessful aortogram, despite "incidents of abdominal pain," (4) failed to monitor Snelson closely, and (5) failed to perform serial physical examinations of Snelson. Snelson also alleged that St. Mary's, through its nursing staff, negligently (1) failed to inform Kamm of Snelson's symptoms immediately following the unsuccessful aortogram, (2) failed

to adequately monitor Snelson, and (3) failed to perform sufficient diagnostic tests immediately following the unsuccessful procedure, despite incidents of abdominal pain.

At the June 1999 jury trial, the evidence showed the following.

## A. Snelson's Hospitalization

In March 1994, Snelson, who was then 58 years old, was suffering from severe peripheral vascular insufficiency (poor blood circulation) in his legs, which was caused by arteriosclerosis (commonly referred to as hardening of the arteries). Snelson's family doctor had referred him to Kamm, a general surgeon, for treatment. Kamm suggested that Snelson undergo an aortogram to determine the exact locations of the arterial blockages. On March 2, 1994, Snelson and his son, James, arrived at St. Mary's so that Snelson could undergo a translumbar aortogram, a procedure in which dye is introduced through the patient's back into the aorta to study the aorta itself and its branches. (An aortogram is also referred to as an arteriogram.) Possible complications from such a procedure include (1) bleeding from the puncture site; (2) the breaking off of a clot from the aorta, which then blocks a blood vessel; (3) an allergic reaction to the dye; (4) infection; and (5) kidney damage.

Dr. Carlos Capati, a radiologist, testified that around noon on March 2, he attempted to perform a translumbar aortogram on Snelson. However, he had difficulty navigating the guide wire into the thoracic aorta, and it appeared that the guide wire was instead going into the superior mesenteric artery, which supplies blood to the intestine. Capati took out the translumbar needle and the guide wire and attempted to reinsert the guide wire into the aorta; however, he again had problems doing so. During the second attempt, Snelson's blood pressure began dropping and he complained of abdominal and back pain. Capati stopped the procedure and Snelson's blood pressure returned to normal. Snelson then expressed an urge to have a bowel movement and a portable commode was brought in. Capati examined Snelson's stool but did not see any discoloration. At that point, Capati decided to stop the aortogram. He then informed Kamm that he had been unable to complete the aortogram and Snelson was complaining of back and abdominal pain.

Snelson's son, James, testified that following the unsuccessful aortogram, he saw his father being brought back to his hospital room on a stretcher. James stated that his father was "screaming and yelling." Once in Snelson's room, James assisted the nurses in getting his father back in bed. At that point, Snelson began complaining about "a lot of pain in his stomach." He also complained of "pressure" in his stom-

ach and the need to urinate. Snelson asked that the nurses insert a catheter to empty his bladder, and around 3 or 3:30 p.m. they did so. James left the hospital that afternoon before Kamm checked in on Snelson. Around 8 p.m., James spoke with his father, who was still complaining of pain and talking like he "didn't know who, what, when or where was going on."

None of the nurses who testified at the trial had any independent memory of the events of March 2 or 3, 1994. However, the nurses on staff during that time recorded notes on Snelson's condition. Those notes indicated that, following the unsuccessful aortogram, Snelson returned to his hospital room around 12:40 p.m. At that time, he was complaining of abdominal pain and cramping and insisted that he needed to have a bowel movement. A 12:44 p.m. shift assessment showed that Snelson was alert and complaining of pain that he rated as a "7" on a scale of 1 to 10. At 12:45 p.m., he had a large bowel movement and continued to complain of severe pain across the middle of his abdomen with pain radiating to his back. At that point, the nurses notified Kamm of Snelson's condition. Kamm gave verbal orders that Snelson receive a hemoglobin and hematocrit test and be given pain medication (50 milligrams (mg) of Demerol by muscular injection) every three hours as needed. Kamm also ordered that Snelson's vital signs be taken every 15 minutes for two hours and then hourly thereafter.

From 12:45 p.m. until 2:30 p.m. on March 2, Snelson's vital signs were as follows: (1) his temperature stayed below normal, (2) his respirations were normal, (3) his pulse rose from 80 to 164 during the first hour then dropped to 88 during the second hour, and (4) his blood pressure varied from a low of 120/70 at 1 p.m. to a high of 164/76 at 2:30 p.m.

At 3 p.m., Snelson's temperature had risen slightly to 95.6 degrees Fahrenheit and his blood pressure had dropped to 160/80. The nurses' flow sheet indicated that a nurse inserted a catheter in Snelson's bladder around 3 p.m. At 3:35 p.m., a second shift assessment indicated that Snelson's bowel sounds were normal, but he continued to complain of abdominal pain. At 4 p.m., Snelson's temperature was 96.2 degrees, his pulse was 116, and his blood pressure was 186/98. Around that same time, he had a bowel movement that appeared to contain bloody mucous. The nurses paged Kamm, who was in surgery, and left a message. At 4:30 p.m., Kamm telephoned and spoke with a nurse about Snelson's condition. Kamm testified that, at that point, he believed that the bloody bowel movement was due to a mild hemorrhoid. Kamm told the nurse that he would examine Snelson as soon as he could.

At 6 p.m., Kamm arrived at St. Mary's and examined Snelson. At that time, the nurses' notes, shift assessment, flow sheets, and vital sign records were all available to Kamm. During the examination, Kamm noted that Snelson was complaining of mid-abdominal pain and had difficulty urinating. Kamm found that Snelson's lower abdomen was tender and distended, that his bowel sounds were hypoactive (less than normal), and that he had passed several small blood-tinged stools. In his notes, Kamm recorded a concern "about mesenteric insufficiency or thrombo-embolus with ischemia" (essentially, a blockage of blood flow to the intestine). Kamm testified, however, that at that time he believed that the most likely cause of Snelson's pain was bleeding into his retroperitoneal area as a result of his aorta being punctured during the unsuccessful aortogram.

Kamm further testified that, based on his 6 p.m. assessment, he believed Snelson's condition had stabilized "considerably" from earlier in the afternoon. He thus ordered that the nurses check Snelson's vital signs only every four hours. Because he was concerned about Snelson's abdominal distention, he ordered that Snelson have no food or liquids by mouth. He also increased Snelson's pain medication from 50 mg to 100 mg of Demerol every four hours as needed, ordered that a catheter be inserted, and ordered some laboratory work for the next morning. Kamm thought the catheter was inserted after his 6 p.m. examination of Snelson, but he acknowledged that it could have been ordered before he arrived at St. Mary's as part of a routine postprocedure order. Kamm also stated that the catheter "caused considerable relief" in Snelson's discomfort. Kamm then left St. Mary's for the evening.

Following Kamm's examination of Snelson, Snelson was observed by the nurses at least every hour. According to the nurses' notes, he was sleeping most of the time between 6:30 p.m. and midnight on March 2, although it was noted that he had a bowel movement and received Demerol at 7 p.m. and was awake at 10 p.m. and back asleep at 11 p.m. No documentation exists showing that Snelson's vital signs were taken between 4 p.m. and midnight. Kamm conferred with the nurses before he went to bed around 10 p.m. and was advised that Snelson was stable and nothing had happened worth commenting on. At midnight, Snelson's temperature was 98.3 degrees, his pulse was 128, and his blood pressure was 190/100. The section in the midnight shift assessment concerning level of pain was left blank; however, at 12:45 a.m., on March 3, Snelson received 100 mg of Demerol. At 4 a.m., Snelson's temperature was 99.3 degrees, his pulse was 124, and his blood pressure was 154/90.

Kamm next saw Snelson between 6 and 6:30 a.m. on March 3. At

that time, Snelson had an abnormally high white blood cell count. Over the next four hours, a computerized tomography (CT) scan and X rays were taken, which showed the presence of air in Snelson's small intestine. Capati testified that the test results were consistent with "small and large bowel infarction," which meant that parts of Snelson's small and large bowel loops were gangrenous or dead. He also explained that the most likely cause of that condition was "acute embolism and thrombosis involving the superior mesenteric artery," which meant that either an embolism (a clot or plaque that moves within a blood vessel) or a thrombosis (a plaque or blood clot "that has been in there" and gradually causes blockage) had blocked the superior mesenteric artery. Capati opined that the unsuccessful translumbar aortogram caused the death of portions of Snelson's intestine.

Later that morning, Kamm performed exploratory abdominal surgery on Snelson and found that almost all of his small intestine and the right half of his large intestine were dead due to lack of blood circulation to the area. Kamm removed about 95% of Snelson's small intestine.

Kamm also testified that the nurses had adequately observed Snelson and reported to him everything that he needed to know about Snelson's condition following the unsuccessful arteriogram. He further stated that, if he had wanted to perform surgery sooner, he would have; however, he did not think it was indicated.

### B. Expert Testimony

Dr. James Sarnelle, Snelson's medical expert, testified that he is a general and vascular surgeon and is familiar with the translumbar arteriogram procedure as well as with intestinal surgery. Sarnelle opined that, in Snelson's case, a blood clot had blocked the mesenteric artery during the unsuccessful arteriogram.

Sarnelle stated that he was familiar with the national standard of care for a reasonably well-qualified surgeon as that standard related to a patient in Snelson's condition on March 2, 1994. Sarnelle opined that Kamm breached the standard of care in treating Snelson following the unsuccessful arteriogram. He elaborated that on March 2, Kamm "did not take any action which was necessary to save [Snelson's] small bowel." He further stated that "what [Snelson] really needed was an operation to restore the circulation" (revascularization surgery). Sarnelle based his opinion that Kamm should have performed surgery on March 2 on the "classic" signs and symptoms of ischemia (blockage of the blood supply) of the small intestine that existed during Kamm's 6 p.m. examination of Snelson. In that regard, he testified that Snelson "has all the signs and symptoms of mesenteric ischemia.

In fact, [Kamm] even mentions it in his note at 6 o'clock that he is concerned about ischemia or thrombosis and yet he does nothing, just says will watch closely." According to Sarnelle, the following signs and symptoms should have alerted Kamm to the mesenteric ischemia: (1) Capati's indication that during the unsuccessful translumbar arteriogram the guide line went into the superior mesenteric artery; (2) Snelson's drop in blood pressure and abdominal pain during the unsuccessful procedure; (3) Snelson's need to have an immediate bowel movement during the arteriogram; (4) the bloody bowel movements following the arteriogram; (5) abdominal pain that was severe enough for Kamm to increase the Demerol from 50 to 100 mg; and (6) the distention and tenderness of Snelson's lower abdomen during Kamm's 6 p.m. examination of Snelson on March 2.

According to Sarnelle, a small window of opportunity existed to prevent the permanent loss of Snelson's intestine. At 6 p.m. on March 2, Snelson's vital signs indicated that he was stable enough to have surgery. Sarnelle opined that had revascularization surgery been performed in a timely fashion on March 2, a large portion of Snelson's intestine could have been saved and Snelson would not need to depend on intravenous supplemental nutrition, as Snelson's condition now requires. The latest time that Snelson's intestine could have been saved was around midnight on March 2. Sarnelle based his time frame opinions on the clinical data contained in Snelson's medical records, such as the onset and severity of Snelson's pain, his vital signs, and the appearance of bloody bowel movements.

Sarnelle acknowledged that generally acute mesenteric ischemia is very difficult to diagnose because the typical patient has an onset of abdominal pain with no clear history of the pain's causation. In addition, the typical patient is often elderly and has trouble communicating. Sarnelle stated that Snelson's case was different because, unlike the typical patient who is admitted to the hospital several hours after the onset of pain, (1) Snelson was in the hospital at the time the ischemia began; (2) the problems that developed during the unsuccessful arteriogram involved the superior mesenteric artery; and (3) Snelson developed signs and symptoms quickly and did not just show up at the hospital with "some obscure things" going on.

Sarnelle also opined that Kamm breached the appropriate standard of care by ordering pain medication for Snelson because pain medications may mask a patient's symptoms and make ischemia more difficult to diagnose.

Sarnelle had no opinion regarding the conduct of St. Mary's nursing staff.

During cross-examination, Sarnelle acknowledged that depending

on the cause of mesenteric ischemia, it can sometimes take days for a well-qualified surgeon to diagnose the condition. He also acknowledged that the medical literature does not (1) differentiate between arteriogram-induced mesenteric ischemia and other types or (2) set out certain symptoms as "classic." Sarnelle stated that the possibility that Snelson's intestine did not "die" until 6 or 7 a.m. on March 3 was "extremely remote." Sarnelle has performed intestinal revascularization surgery twice in his career. One of those patients lived and the other died. The mortality rate for such a surgery is over 50%. Sarnelle further stated that he has been involved in 200 medical malpractice cases as a consulting expert and witness. In all of those cases, he worked for the plaintiffs.

Grace McCallum, Snelson's nursing expert, testified that nurses utilize the "nursing process," which is a critical thinking process that defines the standard of care that a nurse should follow. McCallum opined that the nursing process was not followed by St. Mary's nursing staff on March 2, 1994. This failure to follow the nursing process was evidenced by the following: (1) the failure to initiate a nursing care plan for Snelson; (2) the failure to consult with another physician after the nurses found out that Kamm was in surgery at 4 p.m. on March 2; (3) the failure to request a physician after Snelson had a bloody bowel movement at 4 p.m. on March 2; (4) the failure to perform another assessment following the bloody bowel movement; (5) the failure to perform a follow-up evaluation on the effectiveness of Demerol; (6) the lack of nursing notes regarding Kamm's March 2 examination; (7) the failure to perform all ordered vital signs during the evening of March 2; and (8) the failure to call Kamm after checking Snelson's vital signs around midnight on March 2. McCallum opined that the failure to follow the nursing process increases the likelihood of an unfavorable outcome. However, she had no opinion about what ultimately caused Snelson's injury and stated that she would leave that for "medicine to decide." `

Dr. William Pyle, one of Kamm's medical experts, testified that mesenteric ischemia is difficult to diagnose and the ultimate mortality rate is "in excess of 90 percent." Pyle opined that Kamm met the standard of care in his treatment of Snelson on March 2 and 3, 1994. Pyle also opined that "there weren't enough findings or symptoms to justify surgery" on March 2. Pyle further opined that revascularization surgery was not an option because the mesenteric ischemia was most likely caused by a dissection of the artery, as opposed to a sudden blockage due to a blood clot. In addition, he opined that regardless of what caused the ischemia and regardless of when the revascularization surgery occurred, Snelson's intestine most likely could not have been saved.

Dr. Philip Donahue, another of Kamm's medical experts, opined that Kamm did not breach the standard of care by failing to diagnose mesenteric ischemia or failing to perform revascularization surgery on March 2, 1994. He reasoned that earlier surgery was not warranted by the medical evidence and would not have made any difference in Snelson's outcome. Donahue also stated that the "classic" signs of ischemia about which Sarnelle testified were not "classic of anything." Instead, they "were just non[ ]specific signs." Donahue further opined that the death of Snelson's intestine did not occur until sometime around 6 a.m. on March 3.

Mary Delaney, St. Mary's nursing expert, testified that the nurses did not violate the standard of care in treating or monitoring Snelson.

### C. Damages Evidence

Dr. Robert Newlin, Snelson's treating physician, testified that as a result of the March 3, 1994, surgery, Snelson suffers from "short bowel syndrome." Because Snelson no longer has most of his small intestine, he must rely on hyperalimentation to provide him with nutrients. (Hyperalimentation is the intravenous infusion of a solution that contains sufficient nutrients.) The solution is infused into one of Snelson's veins in his upper chest via a catheter. The catheter is a foreign body and bacteria can easily grow on it. Snelson has suffered several infections of his catheter site, some of which required hospitalization. Newlin opined that Snelson will require hyperalimentation for the rest of his life. Newlin estimated that Snelson could live another 10 years. He acknowledged that Snelson's preexisting health problems, including diabetes, high blood pressure, arteriosclerosis, arthritis, and a history of smoking, would considerably shorten Snelson's life expectancy by themselves.

Snelson testified that he must be attached to the hyperalimentation device for 12 hours each day. Sometimes the nutrient solution causes him pain as it enters through the catheter, and he requires help to maintain the catheter and the catheter site. Although Snelson can eat regular food, the portions must be small. He suffers from chronic diarrhea, and he must use the bathroom 15 to 20 times a day. Because of the hyperalimentation, he decided not to return to work and took early retirement. Snelson also presented a medical bill summary, totaling $595,766.35 and prior income tax returns from 1990 through 1994, showing total wages ranging from $16,970 to $40,838.04.

Snelson acknowledged that even before the March 3, 1994, surgery, the arteriosclerosis made it hard to walk and he had to use a wheelchair. Snelson stated that he still hunts, fishes, and travels to Minnesota to fish and to Indiana to see his daughter. He also

acknowledged that his restricted ability to engage in daily activities was largely attributable to his preexisting physical problems.

## D. The Verdict

On this evidence, the jury returned a verdict in Snelson's favor and against both Kamm and St. Mary's and awarded $7 million. Because the completed verdict form contained only the total damage award, the trial court instructed the jury to return to deliberations and itemize the verdict. Shortly thereafter, the jury returned with a verdict in the same amount, itemized as follows: (1) $600,000 for past medical expenses; (2) $1.1 million for future medical expenses; (3) $3 million for pain and suffering; (4) $2 million for loss of normal life; (5) $80,000 for lost earnings; and (6) $220,000 for disfigurement.

## E. Posttrial Proceedings

As earlier stated, following an April 2000 hearing on defendants' posttrial motions, the trial court entered an order (1) granting St. Mary's motion for judgment *n.o.v.* and (2) granting a retrial on the issue of damages. This appeal followed.

## II. SNELSON'S APPEAL

### A. Judgment *N.O.V.*

Snelson first argues that the trial court erred by granting St. Mary's motion for judgment *n.o.v.* because sufficient evidence existed that the actions of St. Mary's nursing staff proximately caused his injuries. We disagree.

■ A judgment *n.o.v.* is properly entered in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). We review *de novo* a trial court's decision on a motion for judgment *n.o.v. McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999).

■ "In a medical malpractice case, Illinois mandates a plaintiff prove (1) the proper standard of care by which to measure the defendant's conduct, (2) a negligent breach of the standard of care, and (3) resulting injury proximately caused by the defendant's lack of skill or care." *Higgens v. House*, 288 Ill. App. 3d 543, 546, 680 N.E.2d 1089, 1092 (1997). Except in very simple cases, the issue of causation in a medical malpractice case is beyond the common knowledge of laypersons. See *Addison v. Whittenberg*, 124 Ill. 2d 287, 297, 529 N.E.2d 552, 556 (1988) (noting that examples of this exception include cases in which "the treatment is so common, or the act so grossly

negligent, that a layman would be able to make a proper evaluation of the challenged conduct"). Thus, a plaintiff generally must present "expert testimony to establish the applicable standard of care, a deviation from the standard, and the resulting injury to the plaintiff." *Higgens*, 288 Ill. App. 3d at 546, 680 N.E.2d at 1092.

In *Gill v. Foster*, 157 Ill. 2d 304, 310-11, 626 N.E.2d 190, 193 (1993), the supreme court affirmed summary judgment for the defendant hospital where a discharge nurse's failure to notify an attending physician of the plaintiff's complaints of chest pain was not the proximate cause of plaintiff's injury because the doctor already knew of the pain and thought it was a normal byproduct of surgery. The court concluded that "even assuming the nurse had breached a duty to inform the treating physician of the patient's complaint, this breach did not proximately cause the delay in the correct diagnosis of the plaintiff's condition." *Gill*, 157 Ill. 2d at 311, 626 N.E.2d at 193.

In *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 18-19, 724 N.E.2d 115, 124 (1999), the appellate court affirmed the trial court's dismissal of the defendant hospital from the plaintiff's action for wrongful death of a stillborn infant because the nurses' failure to earlier notify the physician of certain abnormalities did not cause the delay in performing a cesarean section. In reaching that decision, the *Seef* court stated, in pertinent part, as follows:

"Assuming *arguendo* that the nurses had notified [the physician] several hours earlier, [the physician] admitted that he would have misinterpreted the data on the monitor strips in the same way. *** By his own admission, the nurses' failure to notify [him] earlier made no difference in this case." *Seef*, 311 Ill. App. 3d at 17, 724 N.E.2d at 122-23.

Similarly, in this case, the evidence showed that the failure of St. Mary's nurses to notify Kamm about Snelson's symptoms and vital signs did *not* delay Kamm's diagnosis of the mesenteric ischemia or his surgical intervention. In that regard, Kamm testified that (1) by 6 p.m. on March 2, 1994, he was aware that Snelson's condition could possibly be mesenteric ischemia; (2) the fact that the nursing staff did not take Snelson's vital signs at 10 p.m. on March 2, did not affect his ability to treat Snelson; (3) if he had wanted to do surgery sooner, he would have; however, he did not think it was indicated; and (4) the nurses had adequately observed Snelson and reported to Kamm everything that he needed to know to treat Snelson. Based on Kamm's testimony, the nurses did not have any information which, if communicated to Kamm, would have changed his diagnosis or treatment of Snelson.

In the cases upon which Snelson relies, *Holton v. Memorial Hospi-*

*tal*, 176 Ill. 2d 95, 679 N.E.2d 1202 (1997), and *Suttle v. Lake Forest Hospital*, 315 Ill. App. 3d 96, 733 N.E.2d 726 (2000), evidence was presented showing that if the nurses had communicated specific information to the patient's physician, the physician would have acted differently. See *Holton*, 176 Ill. 2d at 109, 679 N.E.2d at 1208 ("there is testimony in the instant case that the doctors would have undertaken a different course of treatment had they been accurately and promptly apprised of their patient's progressive paresis"); *Suttle*, 315 Ill. App. 3d at 104, 733 N.E.2d at 732-33 ("In the instant case, there is testimony that [the physician] diagnosed [the patient] as suffering from respiratory distress syndrome, rather than hypovolemic shock, because he was *unaware* of [the patient's] velamentous insertion" (emphasis in original); also noting that the physician testified that if he had known of the patient's low blood pressure earlier, he would have called a transplant team).

Despite the lack of such evidence in this case, Snelson contends that the nurses' deviations from the standard of care—by themselves—comprise sufficient evidence that those deviations were a proximate cause of his injuries. We disagree.

As earlier discussed, a medical malpractice plaintiff must present expert testimony to establish the standard of care and that its breach was the cause of the plaintiff's injury. Snelson did not provide the requisite proximate causation testimony to link the nurses' deviations from the standard of care to his injuries. Snelson's nursing expert, McCallum, could not testify regarding proximate cause since she was not a medical expert (see *Seef*, 311 Ill. App. 3d at 20-21, 724 N.E.2d at 125). Indeed, McCallum acknowledged that she did not have the medical expertise to form an opinion regarding proximate causation. Even assuming McCallum qualified as a medical expert, her vague assertions that failure to follow steps in the nursing process "increases the likelihood" of an unfavorable outcome was insufficient to establish proximate causation. In *Nastasi v. United Mine Workers of America Union Hospital*, 209 Ill. App. 3d 830, 837-38, 567 N.E.2d 1358, 1364 (1991), the appellate court affirmed a directed verdict in favor of a hospital, reasoning as follows:

> "Although plaintiff's nursing expert *** did testify that the Hospital's nursing staff did deviate from the proper standard of care when it failed to promptly notify [the physician] *** and although *** plaintiff's medical expert[ ] did testify that delays in prompt diagnosis and treatment could cause poorer ultimate results in patients suffering from plaintiff's condition, there was no medical testimony to substantiate that the acts or omissions of the nursing staff ultimately had any impact at all on the outcome of plaintiff's treatment."

See also *Pumala v. Sipos*, 163 Ill. App. 3d 1093, 1099, 517 N.E.2d 295, 298-99 (1987) (expert's testimony that the earlier the plaintiff's disease was detected, "the better were the chances to cure it" was "insufficient to present a question for the jury"). Moreover, Snelson's medical expert, Sarnelle, did not provide the necessary proximate cause testimony because he admittedly had no opinion concerning the conduct of St. Mary's nursing staff.

On this record, we conclude that all of the proximate causation evidence, when viewed in its aspect most favorable to Snelson, so overwhelmingly favors St. Mary's that no contrary verdict based on that evidence could ever stand. We thus hold that the trial court did not err by granting St. Mary's motion for judgment *n.o.v.*

### B. New Trial on the Issue of Damages

Snelson also argues that the trial court abused its discretion by ordering a new trial on the issue of damages. We disagree.

■ "In determining whether an award is excessive, the test to be used is 'whether *** [the award] falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience.' " *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1063, 645 N.E.2d 284, 293 (1994), quoting *Northern Trust Co. v. County of Cook*, 135 Ill. App. 3d 329, 334, 481 N.E.2d 957, 961 (1985). The factors a court must consider in assessing whether the verdict is excessive include: (1) the permanency and extent of the injuries suffered, (2) the plaintiff's age, (3) the possibility of deterioration in the future, (4) the medical expenses incurred, (5) past and future lost wages, and (6) any restrictions that the injury may have placed on the plaintiff's daily activities. *Tierney*, 268 Ill. App. 3d at 1064, 645 N.E.2d at 293-94. If, after considering all the evidence, the trial court concludes that the jury verdict is excessive, the court "may not allow the verdict to stand but must act to correct the injustice." *Haid v. Tingle*, 219 Ill. App. 3d 406, 410, 579 N.E.2d 913, 916 (1991).

■ ■ In *Maple v. Gustafson*, 151 Ill. 2d 445, 455-56, 603 N.E.2d 508, 513 (1992), the supreme court discussed the appropriate standard to apply when reviewing a trial court's ruling on a motion for a new trial as follows:

"Next, we must determine whether the trial court erred in denying the motion for a new trial. The standard that was mistakenly utilized by the appellate court in determining whether to enter a judgment *n.o.v.*, that the jury's verdict was against the *manifest weight of the evidence*, is instead to be used in determining whether to grant a *new trial* [citation], the application of which is addressed to the sound discretion of the trial court [citations]. A court's rul-

ing on a motion for a new trial will not be reversed except in those instances where it is affirmatively shown that it clearly abused its discretion. [Citations.] In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial. [Citation.] Furthermore, it is important to keep in mind that ' "[t]he presiding judge in passing upon the motion for a new trial has the benefit of his previous observation on the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." ' (*Buer v. Hamilton* (1964), 48 Ill. App. 2d 171, 173-74, [199 N.E.2d 256, 257-58,] quoting *Hulke v. International Manufacturing Co.* (1957), 14 Ill. App. 2d 5, 47 [,142 N.E.2d 717, 739].) If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial; on the other hand, where there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial." (Emphasis in original.)

In addition, in *Craigmiles v. Egan*, 248 Ill. App. 3d 911, 926-27, 618 N.E.2d 1242, 1252-53 (1993), this court discussed the appropriate standard of review on appeal from a trial court's grant of a new trial on the issue of damages as follows:

"In *Greco[ v. Coleman*, 138 Ill. App. 3d 317, 485 N.E.2d 1118 (1985)], as here, the issue was whether the trial court properly granted a new trial on damages because of inadequacy or inconsistency of the award of damages.

The *Greco* court stated:

'It is well established that whether a motion for a new trial is to be granted is within the sound discretion of the trial court and should not be disturbed unless a clear abuse of discretion appears in the record. [Citations.] Since, as a general rule, a new trial will not be granted on the ground that damages in personal injury actions are considered to be inadequate, appellate review of the granting of a new trial limited solely to the issue of damages is essentially a review of the trial court's discretion. An abuse of discretion will be found where there is no recognizable basis in the record to support the granting of a motion for a new trial. [Citation.] ***' (*Greco*, 138 Ill. App. 3d at 322, 485 N.E.2d at 1121)."

Moreover, in *Netzel v. United Parcel Service, Inc.*, 181 Ill. App. 3d 808, 817, 537 N.E.2d 1348, 1354 (1989), the court stated as follows:

"The amount of damages awarded generally is within the discretion of the jury. [Citation.] Nevertheless, a reviewing court can or-

der a new trial if the damages are manifestly inadequate, if proved elements of damages have been ignored, or if the award does not bear a reasonable relation to the plaintiff's loss."

In granting Kamm's motion for a new trial on the issue of damages, the trial court stated, in pertinent part, as follows:

"I am going to grant a new trial to the defendant Kamm on the issue of damages only. The reason for that is that the $7 million verdict in this particular—under the circumstances of this case is definitely outside the range as what is fair and reasonable based on all of the evidence presented."

Although the court set forth additional factors in reaching its decision, we need not discuss those factors. See *In re Estate of Ferguson*, 313 Ill. App. 3d 931, 936, 730 N.E.2d 1205, 1209 (2000) ("A lower court's judgment, not its reasoning, is the crux of appellate review").

■ The evidence showed that, at the time of the failed arteriogram, Snelson was an overweight 58-year-old man, with a history of smoking, diabetes, hypertension, arthritis, and severe arteriosclerosis, which affected his ability to walk. Snelson undeniably suffered a serious injury as a result of the failed arteriogram—namely, the loss of most of his small intestine—and must receive nutrients through a hyperalimentation catheter for the rest of his life. He also suffers from chronic diarrhea. However, his injury did not diminish his life expectancy. In addition, Snelson acknowledged that his restricted ability to engage in daily activities was largely attributable to his preexisting physical problems. Snelson had to have his hyperalimentation catheter replaced on several occasions; however, at the time of trial, he had gone as long as 19 months without special medical assistance. Snelson did not present evidence that his condition was likely to deteriorate in the future. He submitted a summary of his medical bills incurred since March 2, 1994, totaling $595,766.35, which included some bills from physicians who treated him for preexisting problems. Further, as Kamm correctly points out, the jury awarded (1) $1.1 million for future medical expenses in the absence of evidence regarding such expenses, and (2) $600,000 for past medical expenses, which slightly exceeded the amount submitted by Snelson.

This issue is a close one, and this court may have come to a different conclusion on the same facts. However, reviewing the trial court's decision in accordance with the appropriate standard of review, we hold that the trial court did not clearly abuse its discretion by granting a new trial on the issue of damages. We therefore remand this case for a new trial on the issue of damages.

## C. Proof of Injury and Proximate Cause at New Trial

■ Last, Snelson argues, without citation to authority, that if this

court remands for a new trial on the issue of damages, we should instruct the trial court that Snelson is only required to submit evidence of damages stemming from the loss of 95% of his small intestine. In response, Kamm asks this court to follow *Cancio v. White*, 297 Ill. App. 3d 422, 428, 697 N.E.2d 749, 753 (1998), in which the First District Appellate Court held that, during a new trial on the issue of damages, the plaintiff must prove both injury and proximate cause. We agree with Kamm.

In *Cancio*, 297 Ill. App. 3d at 428, 697 N.E.2d at 753, the appellate court stated, in pertinent part, as follows:

> "We find that while plaintiffs were not required to prove liability on the part of defendant, *** plaintiffs were nevertheless still required to prove actual damages before they could recover. As defendant notes, a jury cannot determine the nature, extent[,] and duration of an alleged injury, without first assessing what, if any, injury the plaintiffs suffered as a result of the accident and the extent and duration of any alleged injury."

The *Cancio* court relied, in part, on *Robertson v. Smith*, 40 Ill. App. 3d 174, 351 N.E.2d 576 (1976), in which the plaintiff's action arose out of a car accident. At the outset of the trial, the defendant admitted liability but contested the issue of damages, and the jury found no damages. *Robertson*, 40 Ill. App. 3d at 175, 351 N.E.2d at 577. On appeal, the plaintiff argued that (1) "the verdict of no damages cannot stand because defendant admitted liability at the outset of the trial," and (2) "defendant, by admitting liability, admitted proximate cause and injury because these are elements of negligence liability." *Robertson*, 40 Ill. App. 3d at 177, 351 N.E.2d at 578. The appellate court disagreed for the following reason:

> "In *Jeffrey v. Chicago Transit Authority*, [37 Ill. App. 2d 327, 336, 185 N.E.2d 384, 389 (1962),] the court *** specifically held that even if a defendant's liability is established, a plaintiff must prove actual damages before he can recover.
>
> Applying this rule to the facts of this case, we hold that by his admission of liability[,] defendant admitted that the accident resulted from his negligent operation of his vehicle, and that plaintiff was free from contributory negligence. The mere fact that the accident occurred as a result of defendant's negligence does not, in any way, establish that plaintiff sustained physical injuries. While plaintiff was relieved, under defendant's admission of liability, from proving defendant's negligence and her freedom from contributory negligence, she was required to establish damages occasioned by physical injury." *Robertson*, 40 Ill. App. 3d at 177, 351 N.E.2d at 578-79.

We agree with *Cancio*, *Jeffrey*, and *Robertson*, and we therefore

hold that at the new trial on the issue of damages, Snelson must prove injury and proximate cause.

## III. KAMM'S APPEAL

### A. Kamm's Claim That Sarnelle's Testimony Lacked Foundation

■ Kamm first argues that the trial court abused its discretion by allowing Sarnelle's testimony because it lacked foundation. Specifically, he contends that (1) no medical literature supported Sarnelle's contention that certain signs of mesenteric ischemia are "classic"; (2) Sarnelle had no clinical experience that "would allow him to conclude the existence of 'classic symptoms' which would make immediate surgery the standard of care"; (3) Sarnelle based his opinion regarding the time line for successful surgical intervention on "general principles"; and (4) Sarnelle had testified only for plaintiffs.

Initially, we note that our review of the record indicates that Kamm has forfeited this issue on appeal by failing to object to either the foundation of Sarnelle's testimony or Sarnelle's qualifications at trial. *Wingo v. Rockford Memorial Hospital*, 292 Ill. App. 3d 896, 909, 686 N.E.2d 722, 731 (1997). Moreover, even assuming that Kamm had not forfeited this issue, we conclude that the trial court did not abuse its discretion by allowing Sarnelle's testimony.

An expert's opinion is only as valid as the reasons underlying it. Thus, when an expert's opinion is totally lacking in factual support, it constitutes nothing more than conjecture and guess and should not be admitted. *Harris Trust & Savings Bank v. Otis Elevator Co.*, 297 Ill. App. 3d 383, 393, 696 N.E.2d 697, 705 (1998). "Although opinion witnesses may not base their testimony on conjecture or speculation [citation], they may testify in terms of what 'might or could' have caused the plaintiff's injury." *Hawn v. Fritcher*, 301 Ill. App. 3d 248, 253, 703 N.E.2d 109, 112 (1998); *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 942, 652 N.E.2d 1132, 1139 (1995) (expert testimony may be based on a reasonable degree of medical certainty). The decision to admit opinion testimony lies within the trial court's sound discretion, and a reviewing court will not reverse its decision absent an abuse of discretion. *Van Holt v. National R.R. Passenger Corp.*, 283 Ill. App. 3d 62, 70, 669 N.E.2d 1288, 1295 (1996).

Sarnelle did indicate that he based some of his opinions on Snelson's "classic symptoms" and "general principles." However, he also stated that he based his opinions on the clinical data found in the medical records from Snelson's March 2 and 3, 1994, admission to St. Mary's, including the following: (1) Kamm's report on Snelson's admission history and physical examination; (2) progress notes written by Kamm, Capati, and nurses who attended Snelson; (3) physicians' or-

der sheets; (4) radiology reports; (5) abdominal CT scan reports; (6) a March 3, 1994, operative report; (7) a surgical pathology report; and (8) a discharge summary. Sarnelle also reviewed the discovery depositions of Kamm and Donahue prior to testifying.

In denying Kamm's motion for judgment *n.o.v.*, the trial court stated, in relevant part, as follows:

> "[T]he criticism of Dr. Sarnelle by [Kamm] really goes to the weight of the evidence or testimony presented by him, and I believe that was all argued to the jury at the time. I think suffice it to say that the jury had the option of accepting the testimony of either side's expert witnesses which [was] presented at trial ***."

Given the trial court's discretion in admitting expert testimony, we conclude that the court did not abuse its discretion by admitting Sarnelle's testimony.

Although Kamm has alleged several ways in which Sarnelle's opinion is flawed, he has not demonstrated that Sarnelle's opinion included "so many varying and uncertain factors" that he was required to guess to reach his conclusions. Instead, Kamm's concerns constitute appropriate topics for cross-examination. As the Supreme Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 125 L. Ed. 2d 469, 484, 113 S. Ct. 2786, 2798 (1993), "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." See also *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 897, 647 N.E.2d 618, 627 (1995) (on cross-examination, counsel may probe the weaknesses in the bases of an expert's opinion as well as the general soundness of his opinion). Moreover, the determination of the precise bases for Sarnelle's opinions was exactly the type of factual question that a jury should resolve. See *Maple*, 151 Ill. 2d at 452, 603 N.E.2d at 511 ("Unquestionably, it is the province of the jury to resolve conflicts in the evidence ***").

In this case, Kamm conducted a vigorous cross-examination of Sarnelle, challenging the bases and soundness of his opinions. In addition, one of Kamm's medical experts testified that Snelson's symptoms were not "classic of anything."

### B. The Trial Court's Refusal To Allow Kamm To Cross-Examine Sarnelle Regarding Potential Bias

Kamm next argues that the trial court erred by granting Snelson's motion *in limine*, thus barring any evidence relating to a professional witness referral agency, Guy Sappanaro or Sappanaro, Inc. (hereinafter Sappanaro). Specifically, Kamm contends that the court's ruling (1) barred him from cross-examining Sarnelle regarding his re-

lationship with Sappanaro; and (2) prevented the jury from considering "a true and complete picture of Dr. Sarnelle's financial interest in giving testimony favorable to parties referred to him by Sappanaro."

We agree with Kamm's assertion that parties must be allowed to demonstrate an expert's bias or financial interest through cross-examination. The supreme court has long recognized that "the principal safeguard against errant expert testimony is the opportunity of opposing counsel to cross-examine, which includes the opportunity to probe bias, partisanship[,] or financial interest." *Trower v. Jones*, 121 Ill. 2d 211, 217, 520 N.E.2d 297, 300 (1988). In *Chicago City Ry. Co. v. Handy*, 208 Ill. 81, 83, 69 N.E. 917, 918 (1904), the supreme court stated:

> "It is competent to show that a witness *** is in the employ of one of the litigants regularly or frequently as an expert witness, or *to prove facts and circumstances which would naturally create a bias in the mind of the witness for or against the cause of either of the litigants.*" (Emphasis added.)

See also M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 607.7, at 434 (7th ed. 1999) ("Matters that may reasonably be expected to color the testimony of a witness or cause him to testify falsely are proper subjects of inquiry of any witness by any party"). Sarnelle's relationship with a professional witness referral agency clearly is a matter that may reasonably be expected to color his testimony or naturally create a bias. Further, a jury could reasonably view a doctor's testimony differently if that doctor is a member of some professional witness referral agency and is essentially an expert for hire rather than if the doctor had been contacted by the party's attorney solely upon the doctor's reputation as a practitioner. Because each trial involves a search for the truth, evidence of witness bias and financial interest should not be concealed from the fact finder, especially when the plaintiff's entire case rests on the testimony of one expert, as happened in this case.

Had the trial court barred the evidence relating to Sappanaro *following* an adequate offer of proof, we would reverse. However, our review of the record does not show that Kamm made an offer of proof detailing how Sarnelle would respond to questions about his relationship with Sappanaro. (Kamm's written response to the motion *in limine* states only that "[t]he testimony of the experts for the [p]laintiff is that they have received other referrals from Sappanaro.") This failure prevents us from determining how the trial court's *in limine* ruling prejudiced Kamm and whether such prejudice affected the outcome of the trial. See *Pempek v. Silliker Laboratories, Inc.*, 309 Ill. App. 3d 972, 984, 723 N.E.2d 803, 813 (1999) (declining to review trial court's

evidentiary ruling because the appellate court was unable to determine whether error affected the trial's outcome).

When a party seeks to have a reviewing court determine whether the trial court's evidentiary rulings improperly restricted the examination of a witness, the record must be clear regarding what the witness' testimony would have been. *Holder v. Caselton*, 275 Ill. App. 3d 950, 955, 657 N.E.2d 680, 685 (1995). In *People v. Land*, 241 Ill. App. 3d 1066, 1086, 609 N.E.2d 1010, 1024 (1993), this court elaborated on this point, as follows:

> "[O]ffers of proof are designed to eliminate such speculation and not only to give the trial court the opportunity to better understand the nature of the proffered evidence—and thereby reevaluate its prior ruling—but also to give courts of review the opportunity to see precisely the nature of the evidence the appellant complains the trial court improperly excluded."

Counsel makes an adequate offer of proof if he informs the trial court, with particularity, of the substance of the witness' anticipated answer. *People v. McMillan*, 239 Ill. App. 3d 467, 489, 607 N.E.2d 585, 601 (1993). In *People v. Andrews*, 146 Ill. 2d 413, 421, 588 N.E.2d 1126, 1131 (1992), the supreme court held that "[a]n offer of proof that merely summarizes the witness' testimony in a conclusory manner is inadequate." The failure to make an adequate offer of proof forfeits the issue on appeal. *Andrews*, 146 Ill. 2d at 422, 588 N.E.2d at 1132; *Holder*, 275 Ill. App. 3d at 955, 657 N.E.2d at 685.

Because Kamm failed to make an adequate offer of proof at trial, this court cannot know the exact nature of the evidence Kamm claims the trial court erroneously excluded. Kamm could have made an adequate offer of proof in this case by asking Sarnelle questions such as the following: (1) How did Sarnelle find out about the professional witness referral agency? (2) How long has he been associated with the agency? (3) How does he receive referrals from the agency? (4) How many referrals has he received from the agency? (5) How does the agency compensate him? and (6) How much money has the agency paid during his association with it? Kamm would have been entitled to ask these sorts of questions during an offer of proof, and had he done so, we would have a much better idea of how he was prejudiced by the court's *in limine* ruling. However, we decline to speculate what such an offer of proof might have revealed. We therefore decline to review the trial court's *in limine* ruling barring cross-examination of Sarnelle regarding his relationship with Sappanaro.

### C. Jury Instructions

#### 1. *Standard of Review*

The plaintiff has the right to have the jury clearly and fairly

instructed on any theory supported by the evidence. To justify an instruction, some evidence in the record must support the theory. The trial court has discretion in determining what issues are raised by the evidence. *Leonardi v. Loyola University*, 168 Ill. 2d 83, 100, 658 N.E.2d 450, 458 (1995). Giving or denying a jury instruction is also within the trial court's discretion (*Trimble v. Olympic Tavern, Inc.*, 239 Ill. App. 3d 393, 401, 606 N.E.2d 1276, 1282 (1993)), and we will grant a new trial because of improper jury instructions only where the party has suffered serious prejudice from the offending instruction (*Thompson v. MCA Distributing, Music Corp.*, 257 Ill. App. 3d 988, 991, 629 N.E.2d 206, 208 (1994)). In determining the adequacy of jury instructions, this court considers whether, considering the instructions as a whole, the jury was fairly, fully, and comprehensively informed as to the relevant principles. *Campbell v. Wagner*, 303 Ill. App. 3d 609, 611, 708 N.E.2d 539, 541 (1999).

### 2. *Snelson's Issues Instruction*

Kamm argues that the trial court erred by giving Snelson's instruction No. 26, which provided, in pertinent part, as follows:

> "The plaintiff claims that he was injured and sustained damage, and that the defendants were negligent in one or more of the following respects:
>
> Defendant Donald Kamm in:
>
>     * * *
>
> (E) Prescribing pain medications to Robert Snelson once he was concerned with mesenteric insufficiency."

Specifically, he contends that the instruction was improper because Sarnelle did not testify that Snelson suffered any injury from the pain medication.

Initially, we note that Kamm has forfeited this issue on appeal by failing to specifically object to paragraph "(E)" of Snelson's instruction No. 26. Indeed, during the jury instruction conference, Kamm's attorney stated that "(e) I think is supported by the contentions of Dr. Sarnelle." See *Moore v. Centreville Township Hospital*, 246 Ill. App. 3d 579, 598, 616 N.E.2d 1321, 1334 (1993), *rev'd on other grounds*, 158 Ill. 2d 543, 634 N.E.2d 1102 (1994) (to preserve an objection to an instruction, the objection must be set forth with specificity so that the trial court can adequately be advised of the specific nature of the objection before it rules).

Assuming Kamm had not forfeited this issue on appeal, we hold that the trial court did not abuse its discretion by giving Snelson's instruction No. 26. As Snelson points out, his theory was that administering pain medications in his case was a deviation from the standard of care because such medications made his condition more

difficult to diagnose. Through Sarnelle's testimony, Snelson presented at least some evidence to support that theory.

### 3. *Snelson's Instruction on Circumstantial Evidence*

■ Kamm also argues that the trial court erred by giving Snelson's instruction No. 3, which provided that "[a] fact may be proved by circumstantial evidence. Circumstantial evidence consists of proof of facts or circumstances which give rise to a reasonable inference of the truth of the facts sought to be proved." Illinois Pattern Jury Instructions, Civil, No. 1.03 (3d ed. 1995) (hereinafter IPI Civil 3d). We disagree.

In a civil case, where any of the evidence is circumstantial, a party is entitled to an instruction on circumstantial evidence. *Kane v. Northwest Special Recreation Ass'n*, 155 Ill. App. 3d 624, 630, 508 N.E.2d 257, 261 (1987). We agree with Snelson that circumstantial evidence was presented regarding his level of pain on March 2 and 3, 1994, and Donahue's opinion that the loss of blood supply to the intestine was not immediate was partly based on Snelson's level of pain on the evening of March 2. Because at least some circumstantial evidence was presented at trial, we conclude that the trial court did not abuse its discretion by giving Snelson's instruction No. 3. See *Campbell*, 303 Ill. App. 3d at 612, 708 N.E.2d at 542 (in which this court affirmed the trial court's refusal to give a circumstantial evidence instruction in a medical malpractice case but also noted that the trial court would not have erred by giving the instruction).

Even assuming that the trial court erred by giving this instruction, we conclude that Kamm was not seriously prejudiced by it. See *Thompson*, 257 Ill. App. 3d at 991, 629 N.E.2d at 208.

### 4. *Snelson's Instruction on Personal Knowledge*

■ Kamm next argues that the trial court erred by giving Snelson's instruction No. 4, which provided as follows:

> "In considering the evidence in this case you are not required to set aside your own observation and experience in the affairs of life, but you have a right to consider all the evidence in the light of your own observation and experience in the affairs of life."

See IPI Civil 3d No. 1.04.

We agree with Snelson that although jurors cannot use their personal observation and experience in the affairs of life to determine whether a physician or a nurse committed malpractice, jurors can use such observation and experience in assessing damages. In addition, we note that the trial court also submitted Snelson's instruction No. 24, which informed the jurors that they could not use their personal knowledge to determine the issues of professional negligence (see IPI

Civil 3d No. 105.02). Under these circumstances, the court did not abuse its discretion by giving Snelson's instruction No. 4.

### 5. *Snelson's Instruction on Future Pain and Suffering*

■ Kamm also argues that the trial court erred by giving Snelson's instruction No. 20, a verdict form that provided, in pertinent part, as follows:

"We find that the total amount of damages suffered by Robert Snelson as a proximate cause of the occurrence in question is itemized as follows:

\* \* \*

The pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries \*\*\*."

See IPI Civil 3d No. B45.03.A.

. As earlier noted, to justify an instruction, some evidence in the record must support the theory. *Moore*, 246 Ill. App. 3d at 599, 616 N.E.2d at 1335. Here, Snelson testified that he suffers from chronic diarrhea and sometimes experiences pain when nutrients enter his body through the hyperalimentation catheter as well as from the catheter itself. That evidence was sufficient to warrant giving Snelson's instruction No. 20, and we thus hold that the trial court did not abuse its discretion by submitting it.

### 6. *Snelson's Instruction on Loss of Normal Life*

■ Last, Kamm argues that the trial court erred by giving Snelson's instruction No. 12, a nonpattern jury instruction that substituted "loss of normal life" as an element of damages in place of the term "disability" (see IPI Civil 3d No. 30.04). We agree, as did the trial court at the hearing on Kamm's posttrial motion.

Supreme Court Rule 239(a) provides as follows:

"Whenever Illinois Pattern Jury Instructions (IPI) contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." 177 Ill. 2d R. 239(a).

In *People v. Hall*, 195 Ill. 2d 1, 30 (2000), the supreme court recently discussed the use of pattern jury instructions as follows:

" 'Instructions found in IPI were drafted with the goal of sharply reducing the number of cases in which jury verdicts were set aside because of erroneous instructions. Consequently, each instruction was painstakingly drafted with the use of simple, brief[,] and unslanted language so as to clearly and concisely state the law. *To insure the use of such instructions, this court adopted Rule 451(a), which requires that an instruction in IPI be given where applicable,*

*unless the court determines that the instruction does not accurately state the law. \*\*\*' People v. Haywood*, 82 Ill. 2d 540, 545[, 413 N.E.2d 410, 413] (1980)." (Emphasis added.)

See also *People v. Chapman*, 194 Ill. 2d 186, 234 (2000), ("Where the court determines that the jury should be instructed on a particular subject and an appropriate IPI instruction exists, it will be used"). What the court stated in *Hall* and *Chapman* fully applies in the context of civil cases. Trial courts should not tinker with IPI instructions. Instead, a court's inquiry should be limited to the following questions: (1) Is an instruction on a particular area of the law appropriate or necessary? (2) Is there an IPI instruction on point? (3) And does the IPI instruction accurately state the law? Assuming the answer to the first two questions is yes, then the IPI instruction on point *must* be used unless the court determines that it does not accurately state the law. See *Van Winkle v. Owens-Corning Fiberglas Corp.*, 291 Ill. App. 3d 165, 177-78, 683 N.E.2d 985, 994 (1997).

The damages instruction on the element of loss of normal life offered by Snelson and tendered by the trial court was predicated on *Smith v. City of Evanston*, 260 Ill. App. 3d 925, 631 N.E.2d 1269 (1994). In *Smith*, 260 Ill. App. 3d at 933, 631 N.E.2d at 1275, the trial court granted a new trial on damages, believing that the jury had misunderstood the pattern instruction on disability. The appellate court affirmed, agreeing that the jury had been confused by the pattern instruction. The *Smith* court concluded that the remedy was to substitute the phrase "loss of normal life" for the term "disability" when instructing the jury at a new trial. *Smith*, 260 Ill. App. 3d at 938, 631 N.E.2d at 1279. The *Smith* court did *not* hold that the pattern instruction was wrong; instead, it held that the phrase "loss of normal life" was simply better than the term "disability." By indiscriminately modifying that instruction, the *Smith* court acted as a *de facto* IPI committee, which it clearly should not have done.

Because IPI Civil 3d No. 30.04 accurately states the law, trial courts should instruct jurors on the element of disability rather than substituting the element of loss of normal life contained in *Smith*. See *Tornabene v. Paramedic Services of Illinois, Inc.*, 314 Ill. App. 3d 494, 502, 731 N.E.2d 965, 972 (2000) (holding that the supreme court's recommended disability instruction in IPI Civil 3d No. 30.04 should be given instead of one on loss of normal life); see also *Torres v. Irving Press, Inc.*, 303 Ill. App. 3d 151, 157-58, 707 N.E.2d 248, 253-54 (1999) (concluding same, albeit in *dicta*). Thus, on remand for a new trial on the issue of damages, the trial court should follow IPI Civil 3d No. 30.04.

## D. Evidence of Snelson's Medical Bills

■ Kamm next argues that the trial court erred by admitting into evidence all of the medical bills Snelson had incurred since entering St. Mary's on March 2, 1994, totaling $595,766.35. Specifically, he contends that some of those medical bills related to treatment Snelson received for preexisting health problems, including diabetes, high cholesterol, and hypertension.

Our review of the record shows that Kamm objected to two of the medical bills on the ground that they were not incurred as a result of defendants' alleged medical negligence. The trial court suggested that Snelson's summary of medical costs could be changed to delete those particular bills. However, the court never revisited the issue and the parties never raised the issue again. Because we are remanding this case for a new trial on the issue of damages, we urge the trial court to carefully examine the medical bills to determine which bills should go to the jury. In doing so, we note that in proving damages the burden is on the plaintiff to establish a reasonable basis for computing damages. *Gill*, 157 Ill. 2d at 313, 626 N.E.2d at 194; see also *Taylor v. R.D. Morgan & Associates, Ltd.*, 205 Ill. App. 3d 682, 688, 563 N.E.2d 1186, 1190 (1990) (an award of damages must be shown to have a causal relationship to the complained-of wrong).

## E. Kamm's Claim That the Jury Considered Extraneous Information

■ Kamm also argues that the jury verdict is "irrevocably tainted" because the jury considered extraneous information in reaching its verdict. Specifically, he contends that a jury question regarding the propriety of a brachial arteriogram, which was sent to the trial court during deliberations, showed that the jury considered extraneous information. We disagree.

A jury should only consider the facts introduced into evidence at trial in rendering a verdict. Any independent investigation by the jury may constitute error so prejudicial as to require reversal. To set aside a verdict, the losing party must show "competent and credible evidence of an improper external influence on the jury." *Johnson v. Danville Cash & Carry Lumber Co.*, 200 Ill. App. 3d 196, 199, 558 N.E.2d 626, 628 (1990); see also *Miller v. Scandrett*, 326 Ill. App. 631, 638, 63 N.E.2d 252, 255 (1945) ("Verdicts should not be set aside on mere suspicion that a juror has acted improperly"). Moreover, while evidence that the jury considered extraneous information can be used to impeach the verdict, not every instance in which unauthorized information reaches the jury results in reversible error. The losing party must first prove that the unauthorized information (1) relates directly

to an issue in the case, and (2) may have improperly influenced the verdict. *Pietrzak v. Rush-Presbyterian-St. Luke's Medical Center*, 284 Ill. App. 3d 244, 251, 670 N.E.2d 1254, 1258 (1996).

During deliberations in this case, the jury sent the following question to the trial court:

> "Was it possible a ~~Break~~ [*sic*] Brachial Arteriogram could have been preformed [*sic*] once Dr. Kamm was concerned with mecenteric [*sic*] insufficiency? or any procedure that could have shown blockage or reduced circulations [*sic*]?"

Based upon nothing more than the jury's submission of this question, Kamm claims that the jury considered extraneous information, which "became a key issue during the jury's deliberations." Such an unsubstantiated allegation is too speculative to prove any misconduct on the jury's part. Kamm does not support his claim with statements from any juror or other evidence that the jury acted improperly by considering extraneous information. See *McMath v. Katholi*, 304 Ill. App. 3d 369, 374, 711 N.E.2d 1135, 1139 (1999) (jurors may testify about their exposure to extraneous information), *rev'd on other grounds*, 191 Ill. 2d 251, 730 N.E.2d 1 (2000). Moreover, although Sarnelle never used the phrase "brachial arteriogram," he did testify as follows:

> "Q. [KAMM'S COUNSEL:] Radiologists are the ones who do this translumbar aortogram, is that true?
>
> A. [SARNELLE:] That's correct.
>
> Q. [KAMM'S COUNSEL:] And so when you say that you order them a lot, I think you said that you don't order this translumbar approach much. How many times a year would you order that?
>
> A. [SARNELLE:] I prefer a different route if they can't go into the groin either *into the brachial artery*, which is in the arm, versus rather than going through the back. It is just a choice." (Emphasis added.)

In addition, Sarnelle testified that when Kamm became concerned about ischemia following his examination of Snelson on March 2, he could have done an arteriogram where he would "go in through the arm to see the circulation." Moreover, during his direct testimony, Sarnelle referred to an aortogram as an arteriogram.

Reviewing the record before us, the jury could have formulated its question based on the evidence presented at trial. We thus conclude that Kamm has not shown "competent and credible evidence of an improper external influence on the jury." See *Johnson*, 200 Ill. App. 3d at 199, 558 N.E.2d at 628. Moreover, even assuming that the jury considered unauthorized information, Kamm has not shown that the jury's consideration of such information may have improperly influenced the verdict in this case.

### F. Kamm's Claim That the Jury Demonstrated Impropriety in Conducting Its Duties

■ Kamm next argues that the jury's hasty itemization of damages constituted "questionable conduct" requiring reversal of its verdict. Because we affirm the trial court's order granting a new trial on the issue of damages, we need not address this issue.

### G. Kamm's Claim That the Verdict Is Against the Manifest Weight of the Evidence

■ Last, Kamm argues that the jury's verdict was against the manifest weight of the evidence. We disagree.

As earlier discussed, in a medical malpractice case, the plaintiff must prove (1) the proper standard of care by which to measure the defendant's conduct, (2) a negligent breach of the standard of care, and (3) resulting injury proximately caused by the defendant's lack of skill or care. *Higgens*, 288 Ill. App. 3d at 546, 680 N.E.2d at 1092. A reviewing court will set aside a jury's verdict only if it is against the manifest weight of the evidence. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242, 665 N.E.2d 1260, 1274 (1996). Under this standard of review, we will reverse a jury verdict only (1) if it is unreasonable, arbitrary, and not based on evidence, or (2) when the opposite conclusion is clearly apparent to us. *O'Donnell v. Holy Family Hospital*, 289 Ill. App. 3d 634, 643, 682 N.E.2d 386, 393 (1997), citing *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512-13. Reviewing courts should scrutinize the evidence but may not sit as a second jury and reweigh the evidence or reevaluate the credibility of the witnesses, especially where conflicting opinion testimony is introduced at trial. *O'Donnell*, 289 Ill. App. 3d at 643, 682 N.E.2d at 393.

This case involved a classic battle of the experts. Witnesses qualified in their fields stated their opinions and gave their reasons for those opinions. Not surprisingly, the plaintiff's experts did not agree with the defense experts. The jury needed to listen to the conflicting evidence and use its best judgment to determine where the truth could be found. The jury found in favor of Snelson and against Kamm, and this court "should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple*, 151 Ill. 2d at 452-53, 603 N.E.2d at 512. We therefore will not disturb the jury's determination here.

### IV. CONCLUSION

For the reasons stated, we affirm the trial court's judgment and

remand with directions for a new trial on the issue of damages in Kamm's favor.

Affirmed and remanded with directions.

McCULLOUGH, J., concurs.

JUSTICE COOK, dissenting:
I respectfully dissent and would reinstate the jury's verdict.

The majority opinion establishes a new two-pronged rule for our district. When a trial court orders a new trial on the basis of inadequate damages, we will give deference to the decision of the jury and reverse. *Craigmiles*, 248 Ill. App. 3d at 927, 618 N.E.2d at 1253 ("jury could have concluded" plaintiff suffered no additional pain and suffering). However, when a trial court orders a new trial on the basis of excessive damages, we will give deference to the decision of the trial court and affirm. 319 Ill. App. 3d at 133 ("the trial court did not clearly abuse its discretion by granting a new trial on the issue of damages").

"A court's ruling on a motion for a new trial will not be reversed except in those instances where it is affirmatively shown that it clearly abused its discretion." *Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513 (new trial requested on the basis that no damages were proximately caused by accident). In *Maple*, however, the trial court *denied* the motion for a new trial. Particular deference should be given the trial court's ruling on a motion for new trial when that ruling supports, rather than overturns, the jury's verdict. *Blakey v. Gilbane Building Corp.*, 303 Ill. App. 3d 872, 884, 708 N.E.2d 1187, 1195 (1999). ·

In fact every case cited by the majority reached a conclusion contrary to that reached by the majority here. All those cases, in one way or another, upheld the verdict of the jury. See *Suttle*, 315 Ill. App. 3d at 110, 733 N.E.2d at 737 (trial court's grant of a new trial, because of plaintiff's prejudicial argument, reversed); see also *Tierney*, 268 Ill. App. 3d at 1063-65, 645 N.E.2d at 293-94 (denial of motion for new trial affirmed, $18.5 million verdict does not shock conscience).

*Maple* goes on to make it clear that the trial court does not have unfettered discretion to set aside a jury verdict.

> "Unquestionably, it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony. [Citation.] A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable. \*\*\*

\* \* \*

\*\*\* If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial; on the other hand, where there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial." *Maple*, 151 Ill. 2d at 452-56, 603 N.E.2d at 511-13.

As with issues of credibility, an award of damages is left to the sound intelligent judgment, or good sense, of the jury. A jury award should be reversed on appeal only if it is evident that the amount resulted from passion or prejudice, and that the amount falls outside the limits of fair and reasonable compensation and shocks the judicial conscience. If a jury's award falls within the flexible range of conclusions reasonably supported by the evidence, it must stand. *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1138, 738 N.E.2d 542, 556 (2000); *Kopczick v. Hobart Corp.*, 308 Ill. App. 3d 967, 979, 721 N.E.2d 769, 779 (1999); *Hastings v. Gulledge*, 272 Ill. App. 3d 861, 863-64, 651 N.E.2d 778, 781 (1995) (adequacy of the verdict is peculiarly within the province of the jury, and great weight is given to the jury's decision).

The majority cites *Haid* for the proposition that when a trial judge concludes that a verdict is excessive the trial judge must act to correct the injustice, and the failure to do so is error. *Haid*, 219 Ill. App. 3d at 410, 579 N.E.2d at 916 (also holding that remittitur should be considered to correct an excessive verdict). *Haid*, however, was a breach of contract case where only one verdict amount was possible.

Does the trial court have the authority to set aside a jury verdict as excessive even when the reviewing court could not do so?

"Furthermore, it is important to keep in mind that ' "[t]he presiding judge in passing upon the motion for new trial has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." ' " *Maple*, 151 Ill. 2d at 456, 603 N.E.2d at 513, quoting *Buer*, 48 Ill. App. 2d at 173-74, 199 N.E.2d at 257-58, quoting *Hulke*, 14 Ill. App. 2d at 47, 142 N.E.2d at 739.

*Maple*, again, was a proximate cause case, not an excessive damages case. Nor is *Buer* or *Hulke* authority for the proposition that the trial court has broad authority to grant a new trial when it is argued that damages are excessive. In *Buer*, the appellate court reversed the grant of a new trial, where plaintiff had complained that the damages were inadequate, noting that it is the jury, not the court, which is the fact-finding body; that the finding of the jury is binding upon the court unless it is unreasonable, arbitrary, and unsupported by the evidence; and the same rule that says that a reviewing court will not reverse the

trial court except in clear cases of abuse of discretion also applies to the trial judge in passing on a motion for new trial. *Buer*, 48 Ill. App. 2d at 175-76, 199 N.E.2d at 258-59. In *Hulke*, the trial court had denied the motion for a new trial. The appellate court affirmed, noting that the amount of damages is primarily a question of fact for the jury, and the question of excessiveness is not to be determined by what we as judges think the damages should have been. *Hulke*, 14 Ill. App. 2d at 49, 142 N.E.2d at 740.

There are many reasons why a court may grant a new trial, and the trial court has greater discretion in some areas than in others. J. Solovy, R. Byman, H. Suskin, B. Levenstam & V. Lazar, 4A Illinois Practice § 5:11, Comments 10 through 18 (West 2000) (Illinois Civil Litigation Guide). The trial court's discretion is at its lowest level when it considers whether damages are excessive, an area peculiarly within the province of the jury.

It is also misleading to say that the trial court has discretion to grant or deny a new trial when the reason for the new trial is judicial error. The trial court cannot prevent the reviewing court from finding error. F. James & G. Hazard, Civil Procedure § 7.17, at 304 (2d ed. 1977). The trial judge, however, does have more room for discretion in granting new trials for impropriety or prejudicial occurrences in the presence of the jury, having peculiar opportunities to observe the characteristics and reactions of the jury. F. James & G. Hazard, Civil Procedure § 7.18, at 307 (2d ed. 1977); see also *Hulke*, 14 Ill. App. 2d at 46, 142 N.E.2d at 739 (in a better position to weigh the effect upon the jury). Where the verdict is said to be excessive or inadequate, the judge has some authority to grant a new trial where the damages are liquidated or can be ascertained by the application of fixed rules of law. Where there are no applicable rules which supply a mathematical formula, or something like it, however, the jury's wide discretion must be recognized. F. James & G. Hazard, Civil Procedure § 7.21, at 321-22, 325 (2d ed. 1977).

A trial court abuses its discretion in granting a new trial only because it would have decided the case differently had it been the trier of fact. *Netzel v. United Parcel Service*, 181 Ill. App. 3d at 816-18, 537 N.E.2d at 1353-54 (new trial on liability reversed; new trial on damages affirmed where counsel requested damages for "loss of job"). An abuse of discretion will be found if there is no basis in the record to support the grant of a new trial. *Lagoni v. Holiday Inn Midway*, 262 Ill. App. 3d 1020, 1028-29, 635 N.E.2d 622, 628 (1994); *Craigmiles*, 248 Ill. App. 3d at 927, 618 N.E.2d at 1253. Where there is sufficient evidence to support the jury's award of damages, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial.

*Maple*, 151 Ill. 2d at 456, 603 N.E.2d at 513. The majority ignores these principles, allowing the trial court to substitute its view of what would be a fair and reasonable verdict for that of the jury, and refusing to interfere with the discretion of the trial court, without considering whether there is any basis in the record to support a new trial.

It is understandable why the majority chooses not to address the factors set forth by the trial court in reaching its decision. Those factors were: (1) the jury only took an additional 5 or 10 minutes when it was pointed out that it had failed to itemize the damages; (2) plaintiff was fortunate to have survived, as these cases have an 80% to 95% rate of fatality; (3) plaintiff offered to settle the case at the start of trial for $500,000 (plaintiff actually offered to settle for the limits of Dr. Kamm's policy, $1 million, apparently to lay a foundation for a wrongful-refusal-to-settle claim); (4) plaintiff's closing argument to the jury for $10 million was not made in good faith; and (5) the jury's question ("was it possible a brachial arteriogram could have been performed") indicates it was attempting to base its decision on something other than the evidence presented. The majority adds another factor not mentioned by the trial court, that the jury awarded plaintiff $1.1 million for future medical expenses in the absence of evidence regarding such expenses. 319 Ill. App. 3d at 133. It appears, however, that plaintiff currently has medical expenses of $7,000 to $10,000 per month connected with hyperalimentation (total parenteral nutrition), the process whereby he is given basic nutrition through an intravenous bag inserted into one of his large veins, with a catheter into his heart. These expenses will last for the rest of plaintiff's life.

As the majority concedes, "Snelson undeniably suffered a serious injury as a result of the failed arteriogram." 319 Ill. App. 3d at 133. What would be an appropriate verdict for a loss of the small intestine, and the loss of the ability to take nutrients by mouth for the rest of one's life? Six million dollars? Three million dollars? The trial court might have awarded something less than that awarded by the jury, but this is not a case where the jury verdict falls outside the limits of fair and reasonable compensation or shocks the judicial conscience. See *Richardson v. Chapman*, 175 Ill. 2d 98, 112-14, 676 N.E.2d 621, 628 (1997) (award in excess of $10 million does not "shock the conscience" where plaintiff suffered devastating, disabling injuries as a consequence of the accident). The majority concedes the jury's verdict was in the ballpark. "This issue is a close one, and this court may have come to a different conclusion [from the trial court] on the same facts." 319 Ill. App. 3d at 133. The majority is able to affirm only by adopting the position that the discretion of the trial court is unreviewable.